**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON**

**LISA MARIE KERR,**

              **Plaintiff,**

**v.**                                                   **Case No. 2:14-cv-12333**

**MARSHALL UNIVERSITY BOARD OF
GOVERNORS, GENE BRET KUHN,
JUDITH SOUTHARD, SANDRA BAILEY,
TERESA EAGLE, LISA HEATON and
DAVID PITTINGER,**

              **Defendants.**

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).   Pending before the court is a Motion to Dismiss filed collectively by all of the defendants (ECF No. 15).

## THE PLAINTIFF'S ALLEGATIONS AND PROCEDURAL HISTORY

The plaintiff, proceeding *pro se*, filed her Complaint on March 14, 2014.   (ECF No. 1).   The plaintiff, who has been trained in the law and had formerly practiced as a licensed attorney, enrolled in Marshall University's (hereinafter "Marshall") Master of Arts in Teaching ("MAT") program during the spring semester of 2012.   In the fall of 2013, the plaintiff enrolled in EDF 677 MAT Level III Clinical Experience, which is a

Credit/No Credit student teaching program (hereinafter "MAT Clinical III program" or "student teaching experience").

The defendants named in the plaintiff's Complaint are: the Marshall University Board of Governors (hereinafter "MUBOG"), Gene Brett Kuhn, an employee of the Boone County Public School District, whom plaintiff asserts was also employed by the MUBOG as a "Public School Supervising Teacher" for the plaintiff in the MAT Clinical III program; Judith Southard, the plaintiff's "University Supervisor" in the MAT Clinical III program; Sandra Bailey, Marshall's Coordinator of the MAT Clinical III program; Teresa Eagle, the Dean of Marshall's College of Education and Professional Development (the "COEPD"); Lisa Heaton, another Dean of the COEPD [on the Marshall University website, Dr. Heaton is listed as the Program Director for Elementary and Secondary Education], and David Pittenger, the Interim Dean of Marshall's Graduate College.

The plaintiff alleges that she had a grade point average ("GPA") of 3.83 and was excelling in her studies prior to the incidents that are the subject of her Complaint. (ECF No. 1 at 5, ¶ 18). The plaintiff further alleges that she had never received a single negative evaluation of her academic or professional performance. (*Id.* at 6, ¶ 19). The plaintiff further alleges that, in the first half of her public school supervised teaching experience, her first Supervising Teacher, Mary Harless, gave her a highly positive evaluation and recommended that she continue to pursue her teaching certification. (*Id.*)

However, according to the plaintiff's Complaint, the second half of her student-teaching experience, when she was placed with Supervising Teacher Gene Brett Kuhn at Scott High School in Boone County, West Virginia, was less positive. The plaintiff

alleges that she witnessed unprofessional conduct by defendant Kuhn, including frequent absences and the unwarranted inflation of student grades.   (*Id.* at 6-7, ¶¶ 22, 24).   The plaintiff's Complaint states that "these observations were qualitatively different from Ms. Kerr's prior student teaching experience in Marshall's MAT program." (*Id.* at 6-7, ¶ 22).   The plaintiff further alleges that her attempts to address these issues with defendant Kuhn were "met with silence or cursory brush-offs."   (*Id.* at 7, ¶ 23). The plaintiff's Complaint further states:

> Having received no meaningful support from defendants Southard or Bailey in response to prior requests, in the exercise of her best professional judgment, Ms. Kerr did her best to work within the situation and provide students with as much benefit as possible, while also increasing her professional experience and knowledge of teaching.

(*Id.*)

The plaintiff further states, however, that, on November 19, 2013, she discovered that defendant Kuhn had been "engaged in ongoing dishonesty" by "inflating the students' grades so substantially that it amounted to a 'free pass' not to do the work that Ms. Kerr had assigned."   (*Id.*, ¶ 24).   The plaintiff alleges that "[i]n light of defendant Kuhn's prior conduct, and the extent to which these new revelations undermined any professional training or experience that Ms. Kerr might further gain in defendant Kuhn's classroom, Ms. Kerr elected to report her concerns to Marshall."   (*Id.*)

Thus, on November 19, 2013, the plaintiff states that she e-mailed defendants Southard and Kuhn and advised them that "Kuhn's conduct had seriously undermined the professional relationship and that, in the exercise of her best professional judgment, [she] would suspend further interaction with defendant Kuhn pending follow-up by Marshall."   (*Id.*, ¶ 25).   The plaintiff states that the e-mail also advised Southard of her

understanding that she had fully satisfied the requirements for her student teaching experience.   (*Id.*)

The following day, November 20, 2013, the plaintiff received a response e-mail from defendant Bailey scheduling a meeting with the plaintiff on December 5, 2013. (*Id.* at 8, ¶ 26).   According to the plaintiff, no other communication occurred between herself and any of the defendants from November 20, 2013 to December 5, 2013.   (*Id.*)

The Complaint further alleges that, on December 5, 2013, the plaintiff met with defendants Bailey and Eagle.   (*Id.* at 8, ¶ 27).   The plaintiff alleges that, during that meeting, the plaintiff was told that she was being denied credit for her student teaching experience, that she would not receive her master's degree and that she would not be recommended for teacher certification.   (*Id.*)   The plaintiff further alleges that defendant Bailey read allegations about the plaintiff's conduct from statements made by defendants Kuhn and Southard.   (*Id.*)

The plaintiff's Complaint focuses on certain statements made by defendant Kuhn in his final evaluation of the plaintiff's student teaching experience (hereinafter "the Kuhn Statement"), which the plaintiff claims are false and defamatory.   (*Id.*, ¶¶ 29, 30).[1]

The plaintiff alleges that the Kuhn Statement contains:

    a.    False accusations of dishonest and unethical conduct against the plaintiff;

    b.    Direct statements by both defendants Kuhn and Southard that the plaintiff was unqualified to become a teacher; and

---

[1] The particular statements that the plaintiff claims are defamatory are not identified in the Complaint and the Kuhn Statement was not attached to the Complaint.   Rather, the Kuhn Statement and other documents contained in the plaintiff's education records were subsequently submitted by the parties and were filed under seal in compliance with the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g(b) and 34 C.F.R., Part 99.

> c.    Evaluations of the plaintiff as "unsatisfactory" in numerous areas in which the plaintiff had previously received consistently positive evaluations, with no evident basis for the change.

(*Id.* at 9, ¶ 30).

The plaintiff further alleges that, by their comments and conduct, defendants Bailey and Eagle "ratified" the Kuhn Statement.   (*Id.* at 9-10, ¶ 32).   The plaintiff alleges that, during the December 5, 2013 meeting, she informed defendants Bailey and Eagle that, based upon direct observations of her performance, she had been asked by two schools to apply for teaching positions, and she would lose those opportunities if Marshall followed through with its decision to not grant her the program credit and her degree.   (*Id.*, ¶ 31).

The plaintiff further alleges that defendants Bailey and Eagle demanded that the plaintiff sign certain papers, including the Kuhn Statement, prior to leaving the meeting. (*Id.* at 10, ¶ 33).   The plaintiff further alleges that the papers were dated November 21, 2013, two days after she had reported her issues with defendant Kuhn to defendant Southard.   The Complaint further states:

> In other words, rather than engaging in the detailed follow-up procedure contained in the Student Teaching Handbook, which mandates notice, an "improvement plan," and an opportunity to correct *any* perceived problem, defendants had determined to deny Ms. Kerr credit, graduation and certification, and had sat on this plan in silence for nearly three weeks while they should have been fulfilling their roles as Ms. Kerr's academic advisors and supervisors.

(*Id.*)   The plaintiff further asserts that defendant Eagle told her that "her only opportunity to be heard would occur during the 'appeal process' *after* Marshall had denied her academic credit, graduation and certification, and *after* the Kuhn Statement

5

had become a part of her permanent record." (*Id.*, ¶ 34) (Emphasis in original)   The plaintiff further alleges that defendant Eagle threatened to disclose the Kuhn Statement to her prospective employers if she followed up on the appeal.   (*Id.*, ¶ 35).

The Complaint further states that, from December 5, 2013 to December 15, 2013, when Marshall's decision was entered into the plaintiff's academic record, the plaintiff repeatedly urged the defendants to reconsider their course of action.   (*Id.* at 10-11, ¶ 36).   Nevertheless, the plaintiff pursued and exhausted the available appeal process.   (*Id.* at 11, ¶ 37).   The plaintiff states that she "wrote extensive statements with supporting exhibits and presented them to defendants Southard, Bailey, Eagle, Heaton and Pittenger, explaining in detail how Marshall had pervasively violated [her] constitutional rights, as well as violating its own written policies contained in the Student Teaching Handbook." (*Id.*, ¶ 37).   The plaintiff further alleges that, throughout the appeal process, the defendants ignored evidence that she presented and "relied upon pretextual excuses to rubber-stamp the wrongful conduct." (*Id.*, ¶ 38).   The Complaint further states:

a.   After Stage One of the "appeal" (to defendants Southard and Bailey), Marshall summarily reiterated that Ms. Kerr would be denied credit, graduation and certification, stating no rationale, and making no response to the arguments and evidence raised in Ms. Kerr's 24-page appeal statement.

b.   After Stage Two of the "appeal" (to defendants Eagle and Heaton), Marshall relied on *new false statements* plainly contradicted by Marshall's own records again without acknowledging Ms. Kerr's evidence or arguments.

c.   After Stage Three of the "appeal" (to defendant Pittenger), Marshall *again* failed to respond to Ms. Kerr's original statement *and* her supplemental statement with 20 exhibits refuting the pretexts Marshall had asserted at Stage Two.   Instead, Marshall concocted a

> *new* pretext, asserting that Ms. Kerr's report to Marshall (on the
> *very day* she learned of defendant Kuhn's deception) was so
> untimely as to be null and void.

(*Id.* at 11-12, ¶ 38) (Emphasis in original)

The plaintiff alleges that the conduct of the defendants has exacerbated her high blood pressure and rapid heart rate and, as a result of the defendants' conduct, she has also developed chronic acid reflux, all of which require daily medications which limit her activities and cause her physical discomfort.   (*Id.* at 12, ¶ 39).

The Complaint contains seven claims for relief:  (1) Defamation; (2) Tortious Interference with Business Expectancy; (3) Tort of Outrage; (4) Violation of Right to Due Process; (5) Violation of Right to Equal Protection (Sexual Orientation Bias); (6) Violation of Right to Equal Protection (No Rational Basis); and Violation of the Fair Labor Standards Act.   (ECF No. 1, *passim*).   The plaintiff seeks recovery of compensatory damages, including back pay, punitive damages, restitution, attorney fees and costs, and various forms of injunctive relief.   (*Id.* at 23-24, ¶ 119).

On May 14, 2014, the defendants, by counsel, filed a Motion to Dismiss, with accompanying exhibits (ECF No. 15) and a Memorandum of Law in support thereof (ECF No. 16).   The Motion and Memorandum of Law assert that the all of the claims against the MUBOG and defendants Southard, Bailey, Eagle, Heaton and Pittenger in their official capacities are barred by Eleventh Amendment immunity.   The Motion and Memorandum of Law further assert that each of the plaintiff's claims for relief must be dismissed, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief may be granted.

On May 28, 2014, the plaintiff filed a Response to the Motion to Dismiss (ECF No. 17).   On June 4, 2014, the defendants filed a Reply (ECF No. 19).   The content of these documents will be discussed *infra*.   This matter is ripe for adjudication.

## STANDARD OF REVIEW

In *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007), the Supreme Court observed that a case should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true, and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."   While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."   *Id.* at 555.

The Supreme Court elaborated on its holding in *Twombly* in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a civil rights case.   The Court wrote:

> Two working principles underlie our decision in *Twombly*.   First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.   Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555, 127 S. Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted).   Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.   Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.   *Id.*, at 556. * * *
>      In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.   When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

556 U.S. at 678-79.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct."   *Id.* at 678.

Furthermore, as noted recently in *Haley v. Virginia Dep't of Health*, 4:12-cv-0016, 2012 WL 5494306, at *2 n.2 (W.D. Va.   Nov. 13, 2012), "[t]he Fourth Circuit has not resolved whether a motion to dismiss based on the Eleventh Amendment is properly considered pursuant to Rule 12(b)(1) or Rule 12(b)(6) . . . The recent trend, however, appears to treat Eleventh Amendment immunity motions under Rule 12(b)(1) [which provides for the dismissal of claims over which the court lacks subject matter jurisdiction]."

## ANALYSIS

### A.    Eleventh Amendment Immunity.

The defendants' Motion to Dismiss and Memorandum of Law in support thereof first asserts that all of the plaintiff's claims against the MUBOG and defendants Southard, Bailey, Eagle, Heaton and Pittenger, in their official capacities, are barred by sovereign immunity established under the Eleventh Amendment to the United States Constitution.   The defendants do not include defendant Kuhn in this analysis, as they contend that he is a county, not a state, employee and, thus, is not subject to Eleventh Amendment immunity.   Their Memorandum of Law states that the plaintiff "incorrectly asserts that Defendant Kuhn was an employee of Marshall University."   (ECF No. 16 at 6 n.15).   In footnote 10 of the plaintiff's Response to the defendants' Motion to Dismiss, however, the plaintiff contends that, at page 51 of the Marshall University Student

Teacher Handbook, it states that "Classroom teachers who serve as supervising teachers must . . . [e]nter into a contractual agreement each semester with Marshall University . . . ." (ECF No. 17 at 7 n.10; ECF No. 15, Ex. E at 51).[2]   The plaintiff further asserts that she has personal knowledge of the executed contract between Marshall and defendant Kuhn, "which included an agreement to pay him a stipend, and aW-9 tax form related thereto." (ECF No. 17 at 7 n.10).[3]

   In pertinent part, the defendants' Memorandum of Law states:

   According to well-settled law, the [MUBOG] is an agency of the State of West Virginia.   *See Zimmeck v. Marshall Univ. Bd. of Governors*, 2013 U.S. Dist. LEXIS 149979, 16-17 (S.D. W. Va. Oct. 18, 2013) (holding that the [MUBOG] is an arm of the state), attached hereto as Ex. G; *see also Graf v. West Virginia University*, 429 S.E.2d 496 (W. Va. 1992).   Any claim brought against a state agency is considered one against the State of West Virginia itself.   *Westinghouse Elec. Corp. v. W. Va. Dept. of Highways*, 845 F.2d 468 (4th Cir. 1988).   Likewise, claims against state officials acting in their official capacities are also considered as claims against the State.   *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989).

   The State of West Virginia has sovereign immunity from suit pursuant to the Eleventh Amendment to the United States Constitution. *See* Article VI, § 35, *West Virginia Constitution*, Eleventh Amendment, *United States Constitution*.   The Eleventh Amendment bars lawsuits

_____

2   The undersigned notes that the plaintiff omitted the rest of this sentence.   The full section of the Handbook reads as follows:   "Classroom teachers who serve as supervising teachers must:   (a)   Hold a valid teaching license for the subject and/or grade levels for the teaching position in which placement is made; (b)   Have a minimum of three years teaching experience during the last five years at the grade levels and in the content area of the student teaching assignment and be recommended by the school principal; and (c) Enter into a contractual agreement each semester with Marshall University and the COEPD to accept student teachers."   (ECF No. 15, Ex. E at 51).

3   The language of the Handbook and the plaintiff's contentions call into question whether defendant Kuhn could be considered an employee of Marshall University, to which Eleventh Amendment immunity would apply, or whether he is, in effect, an independent contractor, to which such immunity may or may not apply.   The undersigned finds that further analysis of this issue is not necessary because, if defendant Kuhn is considered an employee, agent of official of Marshall University, he would be entitled to Eleventh Amendment immunity in his official capacity and, otherwise, the undersigned is proposing that the presiding District Judge **FIND** that the plaintiff's Complaint fails to sufficiently state any plausible claims against defendant Kuhn in his personal capacity.

against a State brought by its own citizens or any citizens of another State. *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299 (2009).  This protection not only protects the State itself, it also protects a State's *agencies, departments, officials* and other "arms of the State."  *Will*, 491 U.S. at 78 (emphasis added); *see also, Roach v. Burch*, 825 F. Supp. 116, 118 (N.D. W, Va. 1993).  As a result, suits against state officials acting in their official capacities are considered as suits against the state itself. *Will*, 491 U.S. at 71.

(ECF No. 16 at 5-6).

The defendants' Memorandum of Law asserts that the plaintiff's claims against the MUBOG are "unquestionably barred by Eleventh Amendment sovereign immunity." (*Id.* at 6).  The defendants further contend that, although the plaintiff did not specifically plead whether she was suing the other defendants in their individual (hereinafter "personal") or official capacities, or both, those defendants would also be immune from suit in their official capacities.  (*Id.*)  Thus, the defendants assert that <u>all</u> of the plaintiff's claims for relief against the MUBOG and all the Marshall defendants in their official capacities must be dismissed.[4]

The defendants also assert that, although there is an exception to Eleventh Amendment immunity for prospective injunctive relief, *see Ex Parte Young*, 209 U.S. 123 (1908), the plaintiff's claims for injunctive relief herein are inappropriate because

---

[4] The defendants' Memorandum of Law asserts that there is overwhelming authority supporting their position.  *See, e.g., Sarkissian v. W. Va. Bd. of Governors*, 2007 U.S. Dist. LEXIS 32881, 36-37 (N.D. W. Va. May 3, 2007) (holding that a defamation claim and claims brought pursuant to 42 U.S.C. § 1983 are barred by sovereign immunity); *Davric Me. Corp. v. United States Postal Serv.*, 238 F.3d 58 (1st Cir. Me. 2001) (holding that the doctrine of sovereign immunity applies to tortious interference claim); *Akers v. Alvey*, 338 F.3d 491, 497 (6th Cir. 2003) (finding sovereign immunity blocks tort of outrage claim); *Alden v. Me.*, 527 U.S. 706 (1999) (holding that sovereign immunity bars claims brought pursuant to the Fair Labor Standards Act of 1938, 29 U.S.C.S. § 201, *et seq.*); *see also*, Ex. G, *Zimmeck, supra*, at pp.16-27 (holding that sovereign immunity protects the MUBOG from § 1983 claims and acknowledging that other causes of action such as intentional infliction of emotional distress are also barred).  (ECF No. 16 at 6).

the plaintiff only seeks injunctive relief from Marshall University[5] (ECF No. 1, ¶¶ 52, 63, 72, 82, 96 and 102), and the *Ex Parte Young* exception only permits prospective injunctive relief against <u>state officials</u> acting in violation of federal law.  *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004); *see also Zimmeck v. Marshall Univ. Bd. of Governors*, 2013 U.S. Dist. LEXIS 149979 [ECF No. 15, Ex. G] at pp. 21-22 ("the Court cannot order prospective injunctive relief as to Marshall University because the Court lacks subject matter jurisdiction over such a claim.")   (ECF No. 16 at 7).   Additionally, the defendants contend that this exception is inapplicable to the plaintiff's First, Second and Third Claims for Relief, because those counts allege violations of state, not federal, law.  (*Id.*)

The plaintiff's Response to the Motion to Dismiss asserts that her Complaint clearly alleges personal capacity claims against each individual defendant.   Her Response states:

> The gist of Defendants' Eleventh Amendment argument is that the Complaint "fails to make any allegations against any Defendant in his or her individual capacity."   Mot. at 6.   That assertion is astonishing. [Footnote omitted].   The Complaint abounds with highly-specific conduct allegations which explain in detail each Defendant's *individual* role and actions.   The Complaint thus pleads individual capacity according to the Fourth Circuit (and majority) standard.   *Biggs v. Meadows*, 66 F.3d 56 (4th Cir. 1995).   Rejecting the presumption of official capacity that the Motion mistakenly applies, *id.* at 57, *Biggs* held:
>
>> Under the standard we now adopt, when a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity . . . . Throughout, the underlying inquiry remains whether the plaintiff's intention to hold a defendant personally liable can be ascertained

---

5  The defendants use the MUBOG and "Marshall University" interchangeably.

fairly.

*Biggs*, 66 F.3d at 61 (internal citations omitted).

(ECF No. 17 at 5-6).   The plaintiff further asserts that "the [MUBOG] is the only defendant sued in its official capacity."   (*Id.* at 6).

The plaintiff also asserts that the MUBOG does not have sovereign immunity because, "[b]y accepting federal funds for the School of Education, MUBOG has waived Eleventh Amendment immunity to Plaintiff's constitutional civil rights claims."   (*Id.*) In support of this contention, the plaintiff cites *Constantine v. Rectors, George Mason Univ.,* 411 F.3d 474 (4th Cir. 2005) (discussing and applying federal-funds waiver to civil rights claims under ADA and Rehabilitation Act) and *Ridpath v. Bd. of Governors, Marshall University*, 447 F.3d 292, 306-07 (4th Cir. 2006).   However, as aptly noted by the defendants in their Reply, *Constantine* largely involved claims under the Americans with Disabilities Act and the Rehabilitation Act of 1974,[6] Congressional Acts in which "Congress clearly intended to abrogate the sovereign immunity of states regarding ADA claims and implicitly abrogated the immunity of state who accepted funds through the Rehabilitation Act as a condition of the receipt of the funds."   (ECF No. 19 at 7).   Thus, the defendants contend that the plaintiff's reliance on *Constantine* is misplaced.   (*Id.*) The defendants also assert that *Ridpath* is inapposite because it concerned issues of qualified immunity against the defendants in their individual capacities, and not sovereign immunity.

---

6   In *Constantine*, the plaintiff also pursued a First Amendment retaliation claim under section 1983 against the defendants in their individual capacities.   That claim did not implicate the Eleventh Amendment.

The defendants' Reply acknowledges that, under *Biggs v. Meadows*, *supra,* the plaintiff's Complaint fairly alleges causes of action against the individual defendants in their personal capacities.   (ECF No. 19 at 7).   Thus, the undersigned proposes that the presiding District Judge **FIND** that, based upon the nature of the plaintiff's claims, the relief sought, and the course of proceedings, the Complaint can be reasonably read to assert claims against the individual defendants in their personal capacities.

As further noted by the defendants in their Reply, and as exhaustively addressed by the presiding District Judge in *Zimmeck v. Marshall Univ. Bd. of Governors*, 2013 U.S. Dist. LEXIS 149979, at 17-22 (S.D. W. Va. Oct. 18, 2013), there are three recognized exceptions to Eleventh Amendment immunity.   The defendants' Reply succinctly addresses the exceptions as follows:

> There are three (3) narrow exceptions to Eleventh Amendment immunity:   (1) a state may unequivocally announce its intention to subject itself to suit in federal court; (2) Congress may abrogate the State's immunity by statute; and (3) suits for prospective injunctive relief against state officials acting in violation of federal law avoid dismissal.   *See Lapides v. Bd. of Regents Univ. Sys.*, 535 U.S. 613, 616 (2002); *see also Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004).

(ECF No. 19 at 6).   The defendants assert that the plaintiff's Complaint fails to properly invoke any of these exceptions.   (*Id.*)

Contrary to the plaintiff's assertions, Congress did not specifically abrogate sovereign immunity for constitutional claims brought under 42 U.S.C. § 1983, *see Quern v. Jordan,* 440 U.S. 332, 345 (1979), and the State of West Virginia has not waived such immunity for section 1983 claims, or any of the state law claims brought in the plaintiff's Complaint.   Thus, the undersigned proposes that the presiding District Judge **FIND**

that the plaintiff's claims for monetary damages against the MUBOG, and defendants Kuhn (to the extent that he may be considered an employee, agent or official of Marshall University), Southard, Bailey, Eagle, Heaton and Pittenger, to the extent that it may be construed in any way that those defendants have been sued in their official capacities, are absolutely barred by the Eleventh Amendment.

The undersigned further proposes that the presiding District Judge **FIND** that the plaintiff cannot properly seek injunctive relief in this court against the MUBOG.   *See Zimmeck* [ECF No. 15, Ex. G] at pp. 21-22 ("the Court cannot order prospective injunctive relief as to Marshall University because the Court lacks subject matter jurisdiction over such a claim."); *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004); *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (Eleventh Amendment exception for prospective injunctive relief applies only to state officials and has no application in suits against States or their agencies). Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff's claims for injunctive relief, which are only sought against the MUBOG, fail as a matter of law.   Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the MUBOG should be dismissed as a defendant herein.

The remainder of this Proposed Findings and Recommendation will address the plaintiff's claims for relief against the individual defendants in their personal capacities.

**B.      Defamation claim.**

In the First Claim for Relief, the plaintiff's Complaint alleges that defendants Kuhn, Southard and Bailey made or ratified false and defamatory statements about the plaintiff.   Specifically, the plaintiff alleges that, in the November 21, 2013 evaluation and

narrative, "Defendant Kuhn made false and defamatory statements which specifically referenced Ms. Kerr, and communicated them to defendants Southard, Bailey and the [MUBOG]."   (ECF No. 1 at 13, ¶ 41).   The Complaint further alleges the following against defendants Southard and Bailey:

> 42.   Defendant Southard ratified, adopted and (on information and belief) actively solicited defendant Kuhn's false and defamatory statements in the November 21, 2013 evaluation and narrative, and communicated them to [the MOBOG] and Bailey.

> 43.   Defendant Bailey ratified, adopted and (on information and belief) actively solicited defendant Kuhn's false and defamatory statements in the November 21, 2013 evaluation and narrative, and communicated them to [the MUBOG].

(*Id.*, ¶¶ 42-44).   The plaintiff asserts that the conduct of defendant Kuhn was intentional and that of defendants Southard and Bailey was at least negligent.   (*Id.*, ¶¶ 45, 46).

The plaintiff claims that she has suffered permanent damage to her reputation and employment prospects, thereby suffering significant income loss and severe emotional distress and physical consequences.   (*Id.,* ¶ 48).   She contends that "the serious nature of the false statements" has "rendered Ms. Kerr unemployable in *any* professional capacity . . . ."   (*Id.* at 14, ¶ 50).

The defendants' Memorandum of Law in support of their Motion to Dismiss asserts that the plaintiff cannot establish the essential elements of a defamation claim under West Virginia law.   The Memorandum of Law states:

> Plaintiff must establish six (6) essential elements to succeed in a defamation action regarding a private individual such as this one:  "(1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury."   *Belcher v. Wal-Mart Stores, Inc.*, 568 S.E.2d 19, 26 (W. Va. 2002), *citing Crump v. Beckley Newspapers, Inc.,* 320 S.E.2d 70, 77 (W. Va. 1983).   In this case, the only

element that Plaintiff can establish is that the allegedly defamatory "Kuhn Statement" does actually reference her.

(ECF No. 16 at 7).   The Memorandum of Law specifically addresses the first element as follows:

> First, Plaintiff cannot establish that any Defendant made defamatory statements or false statements.  In a defamation case, "[a] court must decide initially whether *as a matter of law* the challenged statements in a defamation action are capable of a defamatory meaning." *Belcher*, 568 S.E.2d at 26 (W. Va. 2002) (emphasis in original).  A statement is defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.*  Importantly, "*[a] statement of opinion which does not contain a provable false assertion of fact is entitled to full constitutional protection.*"  *Hupp v. Sasser*, 490 S.E.2d 880, 885-886 (W. Va. 1997) *citing Maynard v. Daily Gazette Co.*, 447 S.E.2d 293, 294 (W. Va. 1994) (emphasis added).

(*Id.* at 7-8).   The defendants then assert that the plaintiff's circumstances are analogous to those in *Hupp*:

> In *Hupp*, a case with remarkably similar facts to the case at bar, the West Virginia Supreme Court analyzed whether or not statements of opinion made by the dean of the journalism school at West Virginia University about a graduate assistant were capable of defamatory meaning.  *Hupp,* 490 S.E.2d at 883-885.   Specifically, the plaintiff in *Hupp* alleged that the dean's characterization of him as "unprofessional" and the dean's comment that his behavior was "unacceptable" were defamatory statements.  *Id.* at 885.   While analyzing the alleged defamatory comments, the West Virginia Supreme Court held that they were not capable of defamatory meaning:
>
> > These statements . . . might not reflect the same conclusion that other individuals would reach when considering (the plaintiff's) behavior, but they are clearly not provably false. *See Potomac Valve & Fitting*, 829 F.2d at 1288 (explaining that statements that are "inherently impossible to prove or disprove" are "protected by the First Amendment"). Accordingly, they are protected under syllabus point four of *Maynard.*

*Hupp*, 490 S.E.2d at 877-888.

17

In this case, just as in *Hupp*, the allegedly defamatory statements contained in the "Kuhn Statement" are nothing more than expressions of opinions that are impossible to prove or disprove.  In fact, just like in *Hupp*, Mr. Kuhn, an academic advisor, used "unprofessional" to describe his opinion of Plaintiff's behavior.  *Hupp*, 490 S.E.2d at 877-888; *see also*, [ECF No. 22] Ex. A, which contains the "Kuhn Statement," previously filed under seal.   The "Kuhn Statement" unquestionably contains statements of opinion that are not capable of defamatory meaning.   As a result, Plaintiff cannot satisfy the "defamatory statements" or "falsity" elements of her claim as a matter of law.   Thus, Plaintiff's defamation claim must be dismissed.

(ECF No. 16 at 8-9).

The defendants further assert that the plaintiff cannot establish that defendants Kuhn, Southard and Bailey made a "nonprivileged communication to a third party."   *See Belcher*, 568 S.E.2d at 27.   In order to prove this element, the plaintiff must establish that these defendants published the allegedly defamatory statements "to a third party who did not have a reasonable right to know . . . ."   *Id.*   In *Belcher*, the SCAWV held that a store employee's accusations of a possible theft by a customer, which were eventually proven false, were not only non-defamatory opinions, but were also privileged communications that were only shared with a police officer, who had a reasonable right to know.

The defendants' Memorandum of Law further states:

"The existence or nonexistence of a qualified privileged occasion . . . in the absence of controversy as to the facts, [is a] question of law for the court."   *Id.*   The legal definition of qualified privilege is well defined in West Virginia:

Qualified privileges are based upon the *public policy that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public. A qualified privilege exists when a person publishes a*

> *statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter* . . .

*Id.* (emphasis added).

Based on the above cited law, Mr. Kuhn's allegedly defamatory statements were privileged.  As a supervising teacher, Mr. Kuhn merely offered his opinions to persons who have a "legitimate interest in the subject matter."  *Id.*  The allegedly defamatory statements were completely confined between Mr. Kuhn and Marshall University personnel.  There was never any publication to any third party who did not have a reasonable right to know.  Mr. Kuhn was required to offer his opinions about Plaintiff's performance.  Likewise, Marshall University personnel had to rely on the statements to evaluate Plaintiff's performance.  Thus, in this case, Mr. Kuhn published a statement in good faith about a subject in which he had an interest or duty (i.e., Plaintiff's performance and attitude in his classroom) and limited the publication of the statement to those persons who have a legitimate interest in the subject matter – Plaintiff's supervising teachers at Marshall University.  *Id.* [Footnote omitted].  As a result, the allegedly defamatory statements are privileged pursuant to West Virginia law.  Therefore, Plaintiff's defamation claim must be dismissed.

(ECF No. 16 at 9-10).

The plaintiff's Response asserts that "there is no qualified privilege to tell a deliberate lie."  *See Crump*, 320 S.E.2d at 78.   (ECF No. 17 at 8).   The plaintiff further asserts that a "[q]ualified privilege requires good faith, which the Complaint expressly negates."  (*Id.*) (*citing* [Compl., ECF No. 1] ¶¶ 3(b)(ii), 28-29) (describing intentional falsehood, and/or reckless indifference to falsity).   The Response further states:

> Moreover, contrary to the Motion's muddled assertions, publication simply requires transmission to one other person.   That is indisputably alleged in the Complaint as to Kuhn, Southard and Bailey.   [Compl.] ¶¶ 41-43.  As for MUBOG, Marshall's placement of the Kuhn Statement in Plaintiff's *permanent* academic record publishes it to Plaintiff's potential employers for the rest of her life.   [Compl.] ¶ 44.

(ECF No. 17 at 8).

The plaintiff further asserts that the "Defendants' assertion of blanket immunity for 'statements of opinion' again overlooks dispositive precedent." (*Id.*)  She claims that "[s]tatements of opinion are actionable when they imply 'undisclosed defamatory facts as the basis for the opinion.'"  *Long v. Egnor*, 346 S.E.2d 778, 788 (W. Va. 1986), *citing* Syl. Pt. 4, *Havalunch, Inc. v. Mazza*, 294 S.E.2d 70 (1981).  (*Id.*)  Thus, the plaintiff asserts that the Kuhn Statement is actionable because it contains "a provably false factual connotation."  *See Hupp,* 490 S.E.2d at 886.  (*Id.*)  Specifically, the plaintiff contends that:

> The Kuhn Statement's "Fourteen Areas of Unsatisfactory Performance" fit that definition, because they falsely imply that Defendant Kuhn observed Plaintiff performing incompetently in areas where she was ranked as "Proficient" or "Distinguished" by everyone else who observed her!  [FN 11 omitted].   The opinions thus contain factual connotations that are provably false.

(*Id.* at 9).   In footnote 11 of her Response, the plaintiff attempts to distinguish her case from *Hupp* on the basis that the trial record in *Hupp* proved that the described behavior of the plaintiff that the school found to be "unprofessional" and "inappropriate" actually occurred and, thus, did not imply any falsehood.   The plaintiff contends that "the Kuhn Statement implies provably-false facts," simply because "all other observers described Plaintiff as 'proficient' or 'distinguished' in the areas where the Kuhn Statement described her as incompetent."   (*Id.* at 9 n.11).

The plaintiff also disputes the defendants' assertion that the Kuhn Statement contains nothing injurious.   The plaintiff's Response states:

> The Kuhn Statement is actually a classic example of defamation *per se*, which in West Virginia includes "imputations which affect a business, trade, profession or office" and imputations of a crime of moral turpitude." *Mauck v. City of Martinsburg*, 280 S.E.2d 216, 219 n.3 (W. Va. 1981);

*citing* Restatement (Second) of Torts §§ 571-74 (1977).   The Kuhn Statement's description of Plaintiff as wholly-unqualified for teaching, as well as its false and groundless allegations of "Fourteen Areas of Unsatisfactory Performance" fit this definition, because they directly affect Plaintiff's profession.   The Kuhn Statement also falsely accuses Plaintiff of criminal conduct (tampering with and/or altering data in a school computer) – a crime of moral turpitude.

Accordingly, taken as a whole, the Kuhn Statement is both defamatory in the ordinary sense, and defamatory *per se.*   [FN 12]

[FN 12 – *See Belcher v. Wal-Mart Stores, Inc.,* 568 S.E.2d 19, 26 (W. Va. 2002) (defamation is that which "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."); Syl. Pt. 1, *Sprouse v. Clay Commc'n, Inc.,* 211 S.E.2d 674 (W. Va. 1975) (statements are defamatory if they "reflect shame, contumely, and disgrace upon" a private individual.)]

(ECF No. 17 at 9-10).

The defendants' Reply reiterates that the plaintiff cannot overcome the fact that the statements that she challenges are not actually "defamatory."   (ECF No. 19 at 8). They assert that "Plaintiff's own Memorandum confirms that the allegedly defamatory statements at issue were opinions which cannot be proven true or false."   (*Id.* at 9). Their Reply further states:

The "Kuhn Statement" and the Kuhn Evaluation Form were drafted by Defendant Kuhn, Plaintiff's supervising public school teacher, during Plaintiff's clinical student teaching course.   Mr. Kuhn drafted both statements after learning that Plaintiff unilaterally abandoned her student-teaching assignment, without notice, after becoming extremely angry about the fact that Mr. Kuhn assigned daily participation points to *his students*, in *his class*.   [Compl., ¶¶ 24, 25].   Leaving the classroom without any warning was expressly prohibited in the Student Handbook. [FN 11]   As a result, in Mr. Kuhn's opinion, Plaintiff's performance and behavior in *his classroom* was unacceptable.   Thus, he did not give her performance a positive evaluation.

[FN 11 – *See* Ex. E at pp. 44, 53-54, attached to Motion to Dismiss. Plaintiff made no effort to request reassignment.   She simply proclaimed

to Defendants Southard and Kuhn that she had satisfied the student teaching requirements and voluntarily terminated her involvement in the class eight (8) days early.]

Importantly, Mr. Kuhn's written *opinion* memorialized his interpretation of about how Plaintiff performed *in his classroom*. Mr. Kuhn, as Plaintiff's supervising teacher, is the only person who can render an opinion regarding whether or not Plaintiff performed satisfactorily while teaching *his class* under *his guidance*. Thus, the "Kuhn Statement" and the Kuhn Evaluation Form contain statements of opinion that are not provably false or capable of defamatory meaning. [Citation omitted].

(*Id.* at 9-10).

The defendants also assert that the plaintiff's "baseless assertions do not change the undisputed fact that all of the Defendants involved in this action had a right to know the contents of the 'Kuhn Statement' and Kuhn Evaluation Form. Thus, Plaintiff's Complaint fails to allege that there was a 'nonprivileged communication to a third party.'" (*Id.* at 10). The Reply further states:

Moreover, Plaintiff's fear that "Marshall's placement of the Kuhn Statement in Plaintiff's *permanent* academic records publishes it to Plaintiff's potential employers for the rest of her life" is misguided puffery. [ECF No. 1 at ¶ 44; ECF No. 17 at 9]. Even if the statements were included in the Plaintiff's "permanent" academic record, [FERPA] severely restricts the disclosure of academic records without a student's consent. [*See* 20 U.S.C. § 1232g(b) and 34 C.F.R., Part 99]. Marshall University cannot even disclose a student's grade transcript unless 1. the student authorizes the disclosure, or 2. the request falls within a narrow set of exceptions contained in 34 C.F.R. § 99.31. [Footnote omitted].

(*Id.*)

Finally, the defendants' Reply attempts to distinguish the plaintiff's case from the cases cited in her Response. The defendants contend that the plaintiff's case is distinguishable from *Long v. Egnor* because "the Kuhn Statement implies only that Plaintiff did not perform well during her student-teaching exercise, which is an entirely

22

subjective opinion.   Moreover, the statements at issue in this case do not even approach the outrageous opinions that were the subject of *Long*."   (*Id.* at 10-11).   The defendants also attempt to distinguish the plaintiff's case from *Mauck v. City of Martinsburg*, which involved an insulting words statute enacted for "(1) racial slurs and vituperative epithets which tend to incite violence and (2) unpublished uttered insults stated to the victim alone."   280 S.E.2d 216 (W. Va. 1981).   The defendants contend that *Mauck* had nothing to do with a common law defamation claim like the plaintiff's.   (*Id.* at 11).

The defendants' Reply further states:

> In sum, Plaintiff may be unhappy with the wording of the "Kuhn Statement" and the eventual grade of "No Credit," but Plaintiff's feelings alone do not give rise to a defamation claim, or excuse her from stating an actionable claim in her Complaint.   The now undisputed facts, the contents of the Complaint, and well-settled defamation jurisprudence all establish that Plaintiff's Complaint fails to state a cognizable claim for defamation.   As a result, Plaintiff's defamation claim must be dismissed.

(*Id.*)

Upon review of the Kuhn Statement and Evaluation, the undersigned proposes that the presiding District Judge **FIND** that the Kuhn Statement and Evaluation are statements of opinion that do not contain a provably false assertion of fact, and that such statements were privileged communications that were only shared with persons who had a right to know about them – that being the persons involved in rendering a grade for the plaintiff's performance in the student teaching experience, and those involved in the appeal process following the decision not to give her credit for the same.   Accordingly, the undersigned further propose that the presiding District Judge **FIND** that, as a matter of law, the Kuhn Statement and Evaluation were non-defamatory, privileged communications and, thus, the plaintiff's Complaint fails to state a claim of defamation

upon which relief may be granted against any of the defendants.   Therefore, the plaintiff's First Claim for Relief must be dismissed.

### C.   Tortious Interference claim.

In the Second Claim for Relief, the plaintiff's Complaint alleges that defendants [MUBOG], Kuhn, Southard, Bailey and Eagle interfered with a business expectancy the plaintiff had for future employment as a school teacher.   The Complaint specifically alleges:

> 55.   Ms. Kerr has a business expectancy, in that she had been invited and encouraged to apply for two teaching positions, based on observations by professional educators of Ms. Kerr's classroom teaching ability.   Prior to defendants' tortious conduct, Ms. Kerr had submitted an application for one of those positions, and she expected to be interviewed as soon as she graduated from Marshall and received her teaching certification.

> 56.   Defendants were not parties to Ms. Kerr's business expectancy.

> 57.   Defendants Kuhn, Southard, Bailey and Eagle recklessly and/or intentionally interfered with Ms. Kerr's business expectancy when they caused false and misleading statements in the November 21, 2013 evaluation and narrative to become part of Ms. Kerr's permanent academic record, and when they denied or conspired to deny Ms. Kerr academic credit, graduation and certification.

> * * *

> 59.   Ms. Kerr incurred injury as a result of defendants' tortious interference with business expectancy, in that she has not been employed or interviewed.   Moreover, Ms. Kerr is now unable to risk applying for *any* positions, because in doing so, she might further spread the false, defamatory statements that defendants have caused to be placed in her permanent academic record.

(ECF No. 1 at 14-15, ¶¶ 55-59).   The plaintiff also repeats her assertion that the defendants' conduct has rendered her unemployable in any professional capacity and caused her permanent economic, physical and emotional damages.   (*Id.*, ¶¶ 60-61).

24

The defendants' Memorandum of Law in support of their Motion to Dismiss asserts that this claim also fails as a matter of law and must be dismissed. The Memorandum states:

> In West Virginia, a tortious interference claim requires proof of four (4) elements: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside of that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages. *C.W. Dev. v. Structures, Inc.*, 408 S.E.2d 41, 44 (W. Va. 1991). Moreover, Defendants "are not liable for interference that is negligent rather than intentional." *Id.* Further, Defendants avoid liability for tortious interference "if they show defenses of . . . their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper." *Id.*

(ECF No. 16 at 10).

The defendants assert that the plaintiff "must agree that she had no ongoing contractual or business relationship at the time of the alleged interference." (*Id.* at 11). Thus, this claim centers on whether the plaintiff had a valid business expectancy with which the defendants intentionally interfered. The defendants' Memorandum of Law further states:

> Specifically, Plaintiff admits in her Complaint that she was merely "invited and encouraged to apply for two teaching positions." [ECF No. 1, ¶ 59]. Moreover, absent appropriate certification of her qualifications to teach in West Virginia, Plaintiff cannot serve as a teacher. Thus, she could not have had any legitimate or realistic expectation regarding the "two teaching positions" because she was not licensed to teach at the time of the alleged interference. As a result, her claim for tortious interference fails as a matter of law.

(ECF No. 16 at 11).

The defendants further contend that the plaintiff cannot establish that there was "an intentional act of interference." *C.W. Dev.*, 408 S.E.2d at 44. (*Id.*) In support of

this argument, the defendants cite to *Sirpal v. University of Miami,* 509 F. App'x. 924 (11th Cir. 2013) (Table), in which the Eleventh Circuit upheld summary judgment for the defendants on a claim where the plaintiff alleged tortious interference with a business relationship by the University of Miami for withholding a dismissed student's transcripts from disclosure to two other universities and informing one of the schools that the plaintiff was undergoing an investigation for research misconduct.   (*Id.*)   The defendants' Memorandum of Law further asserts:

> Here, Defendants had no intent to interfere with Plaintiff's alleged business expectancy.   Defendants merely offered opinions about Plaintiff's performance as a student teacher, responded to her appeal, and decided that Plaintiff did not deserve credit for the clinical student teaching course.   Assuming, *arguendo*, that there was some type of interference, it was justifiable because Defendants were simply giving "honest, truthful requested advice" about Plaintiff's performance after she unilaterally terminated her student-teaching assignment eight (8) days early without Marshall University's approval.   *C.W. Dev.*, 408 S.E.2d at 44.   Therefore, this Court must dismiss Plaintiff's tortious interference claim.

(*Id.* at 12).

The plaintiff's Response asserts that "[t]he evidence will demonstrate that, prior to Defendants' tortious conduct, Plaintiff had been personally asked by her classroom supervisors at Madison Middle School to apply for an 8th Grade position in the Boone County School District, that she did so apply, and that she had a strong, justifiable and documented expectation of being interviewed for that position."   (ECF No. 17 at 11). The plaintiff further asserts that the defendants improperly "rely upon their *own wrongful conduct* – in preventing Plaintiff from obtaining her earned credentials – as a basis to assert that Plaintiff 'could not have had any legitimate or realistic expectation' of becoming employed."   (*Id.*) (Emphasis in original).   Thus, the plaintiff contends that

she has stated a plausible tortious interference claim.

The defendants' Reply reiterates their assertion that the plaintiff's allegations concerning this claim are threadbare, that she has not sufficiently alleged any type of legitimate business expectancy, and that she "brings forth no authority to support her hope that the Complaint sets forth an actionable claim for tortious interference."   (ECF No. 19 at 11-12).

Even taking the plaintiff's factual allegations as true, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff had no valid business expectancy with which the defendants interfered and, thus, the plaintiff's Complaint fails to state a claim upon which relief can be granted concerning the plaintiff's Second Claim for Relief.

### D.   Tort of Outrage.

In the Third Claim for Relief, the plaintiff's Complaint alleges that defendants Kuhn, Southard, Bailey and Eagle's outrageous conduct intentionally or recklessly inflicted emotional distress upon the plaintiff.   (ECF No, 1 at 16-17).   In Syllabus Point 6 of *Harless v. First Nat. Bank in Fairmont*, 289 S.E.2d 692, 694 (W. Va. 1982), the Supreme Court of Appeals of West Virginia (the "SCAWV") set forth the elements of an intentional infliction of emotional distress claim as "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."   Such a claim is also known as the tort of outrage, which is how the plaintiff's claim is plead.   *Id.* at 703.   In particular, the plaintiff's Complaint alleges as follows:

66.     Defendant Kuhn, Southard, Bailey and Eagle recklessly and/or intentionally inflicted emotional distress upon Ms. Kerr by causing false and misleading statements in the November 21, 2013 evaluation and narrative to become part of Ms. Kerr's permanent academic record and by denying or conspiring to deny Ms. Kerr academic credit, graduation and certification.

67.     Furthermore, defendant Eagle recklessly and/or intentionally inflicted emotional distress upon Ms. Kerr by threatening to provide the false and misleading statements in the November 21, 2013 evaluation and narrative directly to Ms. Kerr's prospective employers.

68.     The conduct of defendants Kuhn, Southard, Bailey and Eagle was atrocious, utterly intolerable in a civilized community, and so extreme and outrageous as to exceed all possible bounds of decency.

(ECF No. 1 at 16, ¶¶ 66-68).

The defendants' Memorandum of Law in support of their Motion to Dismiss emphasizes that the circumstances in which liability for intentional infliction of emotional distress or the tort of outrage has been imposed are extremely rare, and that "firm judicial oversight is required in order to avoid losing control over the tort."   *See Hines v. Hills Dept. Store,* 454 S.E.2d 385 (W. Va. 1994) and *Johnson v. Hills Dept. Store*, 488 S.E.2d 471, 476 (W. Va. 1997).   (ECF No. 16 at 12).   Their Memorandum further asserts:

[I]n order to succeed on a claim for intentional infliction of emotional distress, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." *Harless*, 289 S.E.2d at 704-705, *quoting* § 46 of the *Restatement*.  The standard is so stringent that it is not enough even when a defendant "acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle" a plaintiff to punitive damages in another tort claim.   *Id.*

(ECF No. 16 at 13).   Concerning the role of the court in reviewing such claims, the

defendants cite to the SCAWV's decision in *Travis v. Alcon Lab., Inc.*, which held:

> In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Whether the conduct may reasonably be considered outrageous is a legal question . . .

Syl. Pt. 4, *Travis v. Alcon Lab., Inc.*, 504 S.E.2d 419 (W. Va. 1998).    (*Id.* at 12-13).

The defendants' Memorandum of Law also cites several decisions by federal district courts in West Virginia finding that the conduct alleged did not rise to a level sufficient to support a tort of outrage claim and that such allegations must be met with caution. *See, e.g., Bertolotti v. Prunty*, 2010 U.S. Dist. LEXIS 101015 (S.D. W. Va. Sept. 21, 2010) (finding that a Marshall University teacher's public criticism of the abilities of a nursing student with a hearing disability was not outrageous as a matter of law); *Garrett v. Viacom, Inc.*, 2003 U.S. Dist. LEXIS 21007 (N.D. W.Va. Aug. 27, 2003) (holding that broadcasting a convicted murderer's rap song about his crime over the victim's family's objection did not give rise to a tort of outrage claim); *Hamilton v. Life Savers, Inc.*, 1993 WL 757335 (N.D. W. Va. Dec. 28, 1993) (reasoning that comments made by a supervisor that an employee was still untrained after 20 years of service and that the employee was unprofessional did not rise to the required level of outrageousness as a matter of law); *Zimmeck v. Marshall Univ. Bd. of Governors*, 2013 U.S. Dist. LEXIS 149979 (S.D. W. Va. Oct. 18, 2013) (dismissal of medical student did not amount to level of "unbearable outrageousness" necessary to support claim of intentional infliction of emotional distress).    (ECF No. 16 at 13-14).   The defendants contend that:

> In the instant case, Plaintiff was merely not given credit for a course; she was never expelled and can freely return to classes at Marshall University.

> Taking into account the extremely high burden required to sustain a tort of outrage claim, the holding in the *Zimmeck* case, and all of the above discussed cases, Plaintiff's Complaint unquestionably fails to assert facts which even approach the required threshold of outrageous conduct.   As a result, Defendants are entitled to dismissal of Plaintiff's tort of outrage claim as a matter of law.

(*Id.* at 14).

The sole fact addressed by the plaintiff in her Response to the defendants' Motion to Dismiss concerning this claim is defendant Eagle's alleged threat to provide the Kuhn Statement to the plaintiff's prospective employers if the plaintiff pursued her appeal. The plaintiff states that this fact, alone, "would lead any reasonable juror to exclaim 'Outrageous!'" and that "it is difficult to see how Defendants could possibly stoop to justify such an outrage as normal or acceptable conduct."   (ECF No. 17 at 11).

The defendants' Reply contends that the plaintiff has offered no legal authority to support her claim.   (ECF No. 19 at 12).   They further assert that the plaintiff's unilateral abandonment of her student teaching experience resulted in her grade of "No Credit," and that such facts do not give rise to the threshold level of "unbearable outrageousness" necessary to state a plausible tort of outrage claim.   (*Id.*)

The undersigned proposes that the presiding District Judge **FIND** that the allegations contained in the plaintiff's Complaint do not rise to the level of outrageousness necessary to support a claim of intentional or reckless infliction of emotional distress and, thus, the plaintiff's Third Claim for Relief fails to state a claim upon which relief may be granted.

### E.    Due Process claims.

In the Fourth Claim for Relief, the plaintiff's Complaint alleges that defendants

Southard, Bailey and Eagle violated her right to due process of law under the Fourteenth

Amendment to the United States Constitution.   The Complaint further states:

76.    Defendants violated Ms. Kerr's due process rights by depriving her of protected property interests in academic credit, graduation, certification and prospective employment without notice or opportunity to be heard.

* * *

78.    Defendants Southard, Bailey and Eagle, acting as employees of Marshall University, engaged in the foregoing conduct under color of state law.

79.    The foregoing conduct violated clearly established statutory and/or constitutional rights of which a reasonable person would have known.

80.    Ms. Kerr incurred injury as a result of defendants' violation of her right to due process in that her employment prospects and reputation have been permanently damaged, and she has thereby incurred significant lost income, as well as severe emotional distress causing physical consequences.

(ECF No. 1 at 17-18, ¶¶ 76-80).

As appropriately noted by the defendants in their Memorandum of Law in

support of their Motion to Dismiss, in order to sufficiently plead either a substantive or

procedural due process claim, the plaintiff must allege facts to support a finding that she

was "deprived of life, liberty or property, by government action."   *Beverati v. Smith*, 120

F.3d 500, 502 (4th Cir. 1997).   The plaintiff asserts that she was denied a property

interest.   The defendants further note that the Fourth Circuit has clearly defined what

constitutes an individual's property interest:

> A protected interest cannot be created by the Fourteenth Amendment itself, but rather must be created or defined by an independent source.   In order to have a property interest in a benefit, a person must have more than a mere "unilateral expectation of it" or "abstract need or desire for it."

*Equity in Athletics, Inc. v. Dept. of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011).

The defendants also assert that, despite the plaintiff's assertions to the contrary, the Fourth Circuit has never found a property interest in receiving desired academic credit from a graduate school.   *See Nofsinger v. Va. Commonwealth Univ.*, 2012 U.S. Dist. LEXIS 97857 at 18 (E.D. Va. July 13, 2012).   Moreover, as noted by the defendants, several district and appellate courts have held that there is no protected property interest in academic endeavors. S*ee Nigro v. Va. Commonwealth Univ. Med. Coll. of Va.*, 2010 WL 2262539 (W.D. Va. June 4, 2010) (holding that there was no property interest in continuing a residency program); *Davis v. George Mason Univ.*, 395 F. Supp,2d 331 (E.D. Va. 2005), *aff'd* 193 F. App'x. 248 (4th Cir. 2006) (finding that a graduate student failed to demonstrate a property interest in graduate program); *Nofsinger, supra* (holding that a graduate student does not have a protected property interest in continued enrollment); *Bell v. Ohio State Univ.*, 351 F.3d 240, 251 (6th Cir. 2003) (holding that a medical student's interest in continuing her medical school education is not protected by substantive due process).   (ECF No. 16 at 14-15).   The defendants assert that "the above-cited cases make it clear that students do not even have a protected property interest in continued enrollment, let alone desired grades." (*Id.* at 15).   The Memorandum further states:

> In this case, Plaintiff was never expelled from Marshall University.   She merely did not receive the grade she wanted, and she is permitted to re-enroll at Marshall University at any time.   Plaintiff unquestionably does not have a protected interest in receiving desired academic credit.   As

a result, Plaintiff's due process claim fails as a matter of law.

(*Id.*)

The defendants further assert that, even if the plaintiff could establish a protected property interest, her procedural due process claim still fails because she received all of the process she was due.   (*Id.*)   The defendants further assert that courts should give deference to academic decision-making and a faculty's professional judgment.   *See Butler v. Rector & Bd. of Visitors of the Coll. of William & Mary*, 121 F. App'x. 515 (4th Cir. 2005); *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 89-92 (1978) (no formal hearing required); *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985). Thus, the defendants contend that the standard for evaluating whether procedural due process was violated by an academic organization is substantially relaxed.   *Betts v. Rector & Visitors of the Univ. of Va.*, 1999 U.S. App. LEXIS 23105 (4th Cir. Sept. 22, 1999).   The defendants assert that "appropriate due process is provided if the decision involves the exercise of professional judgment and was not arbitrary and capricious." *Id.* (ECF No. 16 at 16).   The defendants again cite *Zimmeck* as a case with substantially similar circumstances.    The defendants' Memorandum of Law states:

> In this case, just like in *Zimmeck*, far more process than required was extended to Plaintiff.   She was aware that she had to meet minimum competency and attendance standards in order to receive credit for her student teaching experience.   [ECF No. 15, Ex. E at 8, 41].   Once plaintiff officially received her grade of "No Credit," she commenced the final-grade appeal process outlined in Marshall University's Graduate Catalog. [ECF No. 15, Ex. F at 55].   Her informal meeting with Defendants Southard and Bailey occurred on January 8, 2014, and a decision was rendered on January 9, 2014, which affirmed denial of credit for EDF 677 [ECF No. 22, Ex. B, filed under seal].
>
> Thereafter, plaintiff initiated the second stage of the appeal process on January 9, 2014, which resulted in a meeting with Defendants Eagle and

> Heaton on January 16, 2014.   A decision re-affirming the denial of credit
> was rendered on January 17, 2014, and was provided to Plaintiff on
> January 21, 2014.   [ECF No. 22, Ex. C, filed under seal].   Plaintiff
> commenced the third and final stage of the appeal process on January 21,
> 2014, which resulted in a meeting with Defendant Pittenger on January 29,
> 2014.   Dean Pittenger rendered a final decision on January 29, 2014,
> affirming Plaintiff's denial of credit for EDF 677.   [ECF No. 22, Ex. D, filed
> under seal].

(*Id.* at 16-17).

The defendants contend that the university was not required by law to afford the plaintiff a final-grade appeal, and that the appeal materials demonstrate that the plaintiff was given all of the process that she was due.   (*Id.* at 17).   The defendants further contend that, while the plaintiff may not agree with the outcome of the process, she has not alleged any facts which would "make it plausible that the decision was based upon anything other than the professional judgment of her professors and Marshall University's academic personnel."   (*Id.*) (*citing Butler*, *supra,* 121 F. App'x. 515 (finding that a dismissed graduate student who disagreed with the outcome of an academic review did not rise to the level of a procedural due process violation).   (*Id.*)

The plaintiff's Response states that the defendants are essentially arguing that academic institutions are exempt from due process requirements.   (ECF No. 17 at 11). The plaintiff further asserts that, to the contrary, it is well-settled that universities must comply with the Fourteenth Amendment.   *See, e.g., Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 155 (5th Cir. 1961).   The plaintiff contends that, in *Dixon*, the Court applied the Due Process Clause to a state university, holding that "[w]henever a governmental body acts so as to injure an individual, the Constitution requires that the act be consonant with due process of law.   The minimum procedural requirements

necessary to satisfy due process depend upon the circumstances and the interests of the parties involved."   (*Id.* at 11-12 n.13)

The plaintiff's Response (ECF No. 17 at 12) further contends that Marshall's Student Teacher Handbook sets forth the minimum process due to a student prior to a negative final evaluation, as follows:

> Supervisors *must* maintain and share with the student teacher any documentation of deficiencies so that he/she can have time to attempt to correct them.   This not only protects *the student's due process rights*, but it protects supervisors from possible grade appeals.

(ECF No. 15, Ex. E at 43) (Emphasis added by the plaintiff).   The plaintiff's Response further contends that the Handbook sets forth procedures for the student-teacher's classroom supervisor (in the plaintiff's case, defendant Kuhn) and university supervisor (in the plaintiff's case, defendant Southard) to "assist in creating a formal written Plan of Improvement as soon as it appears that the student teacher will not pass the field experience at the current level of performance."   (*Id.*)   The Handbook further states:

> This plan will be presented to the student teacher, leaving enough time for the student teacher to make improvements.   This Plan must indicate the problems to be overcome and the deadlines by which significant improvement must be noted.   The university supervisor will put this into writing and help present it to the student teacher.

(*Id.*)

The plaintiff asserts that the defendants completely ignored this process in her case.   (ECF No. 17 at 12).   The plaintiff further asserts that there could not have been an improvement plan in her case, as she contends that there were no deficiencies to address. (*Id.*)   Her Response contends that, on December 5, 2013, defendants Southard and Eagle confronted her in a coordinated fashion and, with no prior notice, accused her of

"gross incompetence which had never before been suggested, and which was contradicted by all prior evaluations."   (*Id.* at 13).   The plaintiff further contends that the Marshall defendants would not even listen to her version of the events, did not care whether the accusations had any basis in fact, and threatened her with retaliation if she challenged their decisions.   (*Id.*)

The plaintiff further disputes the defendants' assertion that notice and a formal hearing are not required, and contends that the authority on which the defendants rely actually emphasizes that prior notice and hearing are both necessary and customary in the academic setting.   (*Id.*)   She further contends that the defendants' reliance on the "appeal" process that was used in her case does not cure their misconduct.   (*Id.*)   She further contends that the defendants have attempted to minimize their misconduct by characterizing it as the plaintiff's dissatisfaction with a grade, rather than a "character assassination."   (*Id.*)

The plaintiff further contends that the "appeal" process in this case was a sham and actually further violated her due process rights as a matter of law.   The plaintiff elaborates on this contention in footnote 15 of her Response:

> Marshall's appeal process takes two forms, depending on whether the contested action is permanent and dispositive (as here), or whether the student simply disagrees with her grade for a course.   Plaintiff was given the *sole* option of submitting to the truncated grade dispute process.   As the Complaint alleges, and as the evidence will show, she was denied all other options.

(ECF No. 17 at 14 n.15).   The plaintiff further contends that the defendants only provided the court with half of the appeal documents – those which are in accord with their own "self-justification."   (*Id.*).   Thus, the plaintiff has submitted additional

documents, including two summaries of her view of the facts and evidence.   The
plaintiff contends that the "sorely-deficient 'appeal' ignored pages and pages of Plaintiff's
arguments and evidence relying instead on false pretexts contradicted by Marshall's own
records."   (*Id.* n.16).   The plaintiff further asserts that, if the proper procedures had
been followed, the allegedly defamatory statements about her would have been removed
from her record, and the injustice she allegedly suffered would never have occurred.
(*Id.* at 14 and n.17).

The defendants' Reply returns to their contention that "our judicial system
encourages all courts to afford great deference to academic decision making."  *See Butler,
supra*, 121 F. App'x at 518.   (ECF No. 19 at 13).   The defendants' Reply further repeats
their arguments that there is no recognized and protected property interest in receiving
academic credit or a degree, and, to the extent that the plaintiff was due any process, she
received that and more.   (*Id.* at 13-14).

The defendants assert that they "had no duty to submit a 'formal written Plan of
Improvement' to Plaintiff because she unilaterally, and without notice, terminated her
student teaching experience."   (*Id.* at 14).   The defendants further attempt to
distinguish the plaintiff's case from that of *Dixon*, which is cited by the plaintiff in her
Response.   Footnote 21 of the defendants' Reply asserts that "*Dixon* involved the
expulsion of African-American students who defied segregation laws.   In light of that
outrageous context, the Fifth Circuit merely held that the students were entitled to a
hearing."   (*Id.* at 14 n.21).   The defendants further assert that "*Dixon* does not advance
Plaintiff's argument because Plaintiff was *granted more than one opportunity to be
heard* and *she was never expelled.*   She is not prohibited from returning to Marshall to

37

complete EDF 677." (*Id.*)

Finally, the defendants reiterate that, to the extent that the plaintiff could establish a property interest, she also cannot succeed with a substantive due process claim, as she cannot demonstrate that the defendants' conduct was "so arbitrary as to shock the conscience." The defendants maintain that the plaintiff has not stated any facts which would make it plausible that the decision of the defendants was based upon anything other than their professional academic judgment, after her decision to unilaterally walk away from the program. (*Id.* at 14-15).

The plaintiff's due process claim appears to be rooted in a contention that the defendants violated the procedures set forth in the Student Teacher Handbook (ECF No. 15, Ex. E). However, courts considering the issue of whether such university handbooks give rise to a property interest sufficient to establish a due process right under the Fourteenth Amendment have declined to find such an interest. *See, e.g., Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 990-991 (10th Cir. 1996) (university faculty handbook did not create a property interest that would support a due process violation out of failure to follow the specified procedures); *Nkwocha v. South Carolina State Univ.*, 2014 WL 1278006 (D. S.C., Mar. 26, 2014) (violation of policies and procedures does not alone give rise to a due process claim).

The plaintiff has not sufficiently rebutted the wealth of authority finding that there is no protected property interest in the continuation of academic endeavors. Thus, she has not established that she had any liberty or property interest that would give rise to the protections of the Due Process Clause of the Fourteenth Amendment. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the

plaintiff's Complaint fails to state a plausible procedural or substantive due process claim and, therefore, her Fourth Claim for Relief must be dismissed.

### F.     Equal Protection claims.

The plaintiff's Fifth and Sixth Claims for Relief both allege that defendants Southard, Bailey, Eagle, Heaton and Pittenger denied the plaintiff's right to equal protection under the law, as guaranteed by the Fourteenth Amendment.   In the Fifth Claim for Relief, the plaintiff alleges that the defendants' conduct was motivated by their knowledge that she is homosexual.   The Complaint specifically states:

86.     Prior to learning of Ms. Kerr's homosexual orientation, Marshall consistently recognized Ms. Kerr as an outstanding student and highly-qualified teacher candidate, and never subjected Ms. Kerr to any negative action.

87.     However, *after* learning of Ms. Kerr's homosexual orientation, defendants engaged in a course of conduct hostile to Ms. Kerr's aspiration to become a middle-school social-studies teacher, including but not limited to pervasive violations of the written policies in Marshall's Student Teacher Handbook as follows:

a.     Denial of academic support for Ms. Kerr's student teaching experience;

b.     Refusal to communicate (amounting to the "silent treatment") about Ms. Kerr's student teaching experience;

c.     Dishonest communications with Ms. Kerr;

d.     Failure to follow up promptly on Ms. Kerr's report of a problem in her placement with defendant Kuhn;

e.     Violation of Ms. Kerr's due process rights;

f.     Attacks on Ms. Kerr's academic and professional reputation.

88.  Defendants' course of hostile and biased conduct toward Ms. Kerr included their reliance on manifestly false, defamatory and retaliatory statements contained in the November 21, 2013 evaluation and narrative as the putative basis for denying Ms. Kerr academic credit, graduation and certification.

89.  When Ms. Kerr attempted to redress the above conduct through Marshall's academic appeal procedure, defendants declined to address or even acknowledge the conduct described above, but instead cited *obviously*-pretextual grounds (contradicted by Marshall's own records) as the putative basis for rejecting Ms. Kerr's appeal.

\* \* \*

91.  A reasonable person would infer from the totality of the defendants' conduct, including reliance on pretext, that defendants' negative actions against Ms. Kerr were substantially motivated by defendants' bias against Ms. Kerr's homosexual orientation.

(ECF No. 1 at 19-20, ¶¶ 86-89, 91).  The undersigned will refer to this claim as the plaintiff's "discriminatory animus" equal protection claim.

In her Sixth Claim for Relief, the plaintiff reiterates her allegations of a denial of her right to equal protection, and contends that the "Defendants' denial of academic credit, graduation and certification to Ms. Kerr was arbitrary and capricious and lacked a rational basis." (*Id.* at 21, ¶ 99).  The undersigned will refer to this claim as a "class-of-one" equal protection claim.

The defendants' Memorandum of Law in support of their Motion to Dismiss contends that the plaintiff cannot sufficiently establish any violation of her rights under the Equal Protection Clause based upon the facts alleged in her Complaint.  The Memorandum of Law states:

In order to withstand a motion to dismiss [concerning] "an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly

40

situated and that the unequal treatment was the result of discriminatory animus. *Equity in Athletics*, 693 F.3d at 108. In this case, Plaintiff asserts that her right to equal protection was violated as a result of "sexual orientation bias" and because the denial of academic credit "lacked a rational basis." [ECF No. 1, pp. 18-21]. However, Plaintiff pleads no facts to support either bald allegation. Moreover, Plaintiff's Complaint contains no explanation of how she was intentionally treated differently than other similarly situated students.

(ECF No. 16 at 17-18). Accordingly, the defendants first assert that this claim should be dismissed in accordance with *Iqbal*, 556 U.S. as 678, because it contains nothing more than conclusory and threadbare allegations. (*Id.* at 18).

The defendants further assert that both of the plaintiff's equal protection theories fail as a matter of law because (1) there was no unequal treatment as a result of discriminatory animus; and (2) there was a rational basis for denying the plaintiff credit for EDF 677. (*Id.*) The defendants again contend that the decision in *Nofsinger v. Va. Commonwealth Univ.*, *supra*, is instructive in this case.

In *Nofsinger*, the plaintiff, who was dismissed from a graduate program for lack of academic progress and a lack of professionalism, filed suit against the university and several individuals, alleging violations of her constitutional rights, including equal protection claims. 2012 U.S. Dist. LEXIS 97857 at 7. The district court dismissed the equal protection claims, finding as follows:

The Court agrees with those courts that have found the public education context an equally poor fit for class-of-one equal protection claims due to the inherently discretionary decision-making that occurs there. *Grading and assessing professionalism – especially in the graduate school context – by necessity involves a host of subjective, individualized assessments. "[T]reating like individuals differently," in this context "is an accepted consequence of the discretion granted" to educators and school administrators.* As the Supreme Court recognized the "common-sense realization that government offices could not function if every employment decision became a constitutional matter," *this Court also recognizes the*

41

> *deleterious effects that would befall our public institutions of higher education if constitutional questions constantly arose out of grades and evaluations.* For all of those reasons, (the plaintiff's) equal protection claims cannot survive.

*Id.* at 33-34, *quoting Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 599-603 (2008) (brackets in original) (emphasis added) (internal citations omitted) [FN 33 omitted].   (ECF No. 16 at 19).   Among other cases cited by the defendants in which the courts found that the class-of-one theory is not appropriate in an academic setting (see footnote 33), the defendants' Reply again refers the court to *Zimmeck*, in which this United States District Court recently dismissed similar claims against Marshall University and several of its employees.   (ECF No. 15, Ex. H, 2014 U.S. Dist. LEXIS 3166, 13-16 (S.D. W. Va. Jan. 10, 2014)).

Relying on *Nofsinger*, the *Zimmeck* court also found that the plaintiff therein had not properly stated a more traditional, "discriminatory animus" equal protection claim because "she does not provide any factual details regarding the students to which she is comparing herself" nor did she plead any facts "that would plausibly link [her] dismissal from the Program to any personal animus or discrimination on the part of the individual Defendants."   2014 U.S. Dist. LEXIS 3166 at 17-18.   Thus, in *Zimmeck*, both the plaintiff's class-of-one and discriminatory animus equal protection claims were dismissed for failure to state a claim upon which relief may be granted.

The defendants' Memorandum of Law further contends:

> Plaintiff's equal protection claims in this case are nearly identical to the ones brought by the plaintiffs in *Nofsinger, Zimmeck* and the numerous other decisions cited in the above paragraph.   Plaintiff cannot establish that she was given "No Credit" as a result of any type of discriminatory animus.   On the contrary, based on the facts in the Complaint, and the documents referenced by the Complaint, Plaintiff was

awarded a grade of "No Credit" because many of her competency ratings regarding her student teaching assignments were considered "Unsatisfactory" and because she missed too many days of class.   Thus, there was undoubtedly a "rational basis "for the decision to give her a grade of "No Credit."   Defendants were merely exercising their broad discretion while "grading and assessing professionalism" in an academic setting as set forth in *Nofsinger*. 2012 U.S. Dist. LEXIS 97857 at 33-34.   Therefore, both of Plaintiff's equal protection claims fail as a matter of law.

(ECF No. 16 at 19).

The plaintiff's Response contends that the defendants are afraid to address her "sexual orientation bias" claim, and that their Motion to Dismiss "conflates this claim with the 'Class of One' claim, and then opposes both on the same grounds."   (ECF No. 17 at 15).   The plaintiff further contends that the United States Supreme Court has made it clear that courts should subject sexual orientation-based claims to heightened scrutiny. (*Id.*) (citing *Lawrence v. Texas*, 539 U.S. 558, 579 (2003) (homosexual intimacy is a liberty interest protected by the Constitution) and *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013) (singling out "unpopular group" cannot justify disparate treatment)).[7] Her Response further states:

> Individual discrimination based on sexual orientation is therefore analyzed under the traditional burden-shifting paradigm.   *See generally Smithkline Beecham Corp. v. Abbott Labs*, No. 11-17357 (9th Cir. Jan. 21, 2014) (for publication) (applying *Lawrence* and *Windsor*; analyzing *Batson* claim based on sexual orientation under heightened scrutiny and burden-shifting doctrines).

(ECF No. 17 at 15).

The plaintiff contends that courts must conduct the burden-shifting analysis on a case-by-case basis.   She further asserts that, in the instant case, two key factors combine

---

7  The plaintiff's Response further contends that, even if the Fourth Circuit should ultimately hold that "sexual orientation is unlike other quasi-suspect classifications (e.g., in the marriage equality case), the Fifth Claim for Relief would still be federally cognizable under other aspects of *Lawrence* and *Windsor*, as well as under Marshall's own anti-discrimination policy."   (ECF No. 17 at 15 n.18).

to establish a *prima facie* case of discrimination based on her homosexual orientation:

1. *Temporal Relationship.* The Complaint alleges that *before* Defendants learned of her homosexual orientation, Plaintiff had an outstanding record at Marshall (and everywhere else), including excellent classroom performance evaluations. [Compl.] ¶¶ 17-19, 86. Then, the Complaint alleges that *after* Defendants learned of her homosexual orientation, they entered into Plaintiff's permanent record drastically-different evaluations which accused her or utter incompetence in the classroom. [Compl.] ¶¶ 21, 29-30, 88.

2. *Reliance on pretext.* The Complaint alleges that Defendants were unable to produce one shred of evidence to support their attack on Plaintiff's professional competence. Instead, Defendants began inventing a series of false pretexts. Each time Plaintiff refuted the pretexts with Defendants' own records, Defendants simply dropped them, and invented new ones which were equally false. [Compl.] ¶¶ 38, 39.

(ECF No. 17 at 15-16). The plaintiff claims that the Complaint contains "many other allegations relevant to the Fifth Claim" which have been ignored by the defendants in their Motion to Dismiss (citing ¶ 87 of her Complaint, which cites to alleged instances of "denial of academic support," "refusal to communicate" with the plaintiff about her student teaching experience, "dishonest communications" with the plaintiff, "failure to follow up promptly" concerning issues with the plaintiff's placement with defendant Kuhn, "violations of [the plaintiff's] due process rights," and "attacks on [the plaintiff's] academic and professional reputation.") (ECF No. 1 at 19, ¶ 87). Thus, the plaintiff asserts that the defendants' Motion to Dismiss "fails to dispute that the Complaint shifts the burden, and they cite no precedent that even speaks to the issue of a *prima facie* discrimination case." (ECF No. 17 at 16).

The plaintiff asserts that she has alleged several ways in which the defendants have "singled out" and treated her differently than other similarly-situated individuals.

Her Response states, "[m]ost notably, she was denied multiple stages of notice and hearing guaranteed by Marshall's own policies ([Compl.] ¶¶ 27-28, 33, 38), and she was subjected to a deliberate smear campaign that permanently injured her reputation and livelihood." [FN 19 omitted]. (ECF No. 17 at 16-17). Therefore, the plaintiff contends that her Complaint meets the *Iqbal* standard, and there is no basis for dismissal of the same. (*Id.*)

The defendants' Reply repeats their assertion that the plaintiff's equal protection claims fail to state facts sufficient to establish either that the plaintiff was subjected to unequal treatment as a result of discriminatory animus, or that the decision to award her "No Credit" for her student teaching experience, and the consequential denial of her degree and certification, lacked a rational basis. (ECF No. 19 at 15-18). Addressing the discriminatory animus claim first, the defendants' Reply states in pertinent part:

> Plaintiff asserts in her Memorandum that the Complaint "alleges several ways that Defendants 'singled out' and treated her differently to those similarly situated. [ECF No. 17 at 16-17] However, the Complaint fails to define who these other students are, how these students were similarly situated when compared to Plaintiff, and in what manner of treatment the Plaintiff was the result of discriminatory animus. *See Nofsinger v. Va. Commonwealth Univ.*, 523 F. App'x 204 (4th Cir. 2013) (affirming decision to dismiss student's equal protection claim when she failed to specify how other students were similarly situated and failed to establish any differential treatment was the result of discriminatory animus).

> \* \* \*

> Merely citing to the fact that you are homosexual and claiming that you deserved a grade you did not receive does not state an actionable equal protection claim. Plaintiff's Complaint fails to allege how Plaintiff's sexual orientation played any part in Marshall University's decision to give her a grade of "No Credit." In reality, Plaintiff was given a grade of "No Credit" because she voluntarily terminated her student-teaching experience, which resulted in a negative evaluation by Defendant Kuhn.

45

Plaintiff failed to meet the requirements of the subject course and, like any other student who does the same, she did not receive passing credit.  Now, Plaintiff argues that by inventing her own criteria for completing the course and declaring her preference for same-sex relationships, she somehow properly pled an equal protection claim.

(ECF No. 19 at 16).

The defendants also reiterate their position that neither the Supreme Court, nor the Fourth Circuit has held that "sexual orientation" is a suspect classification warranting heightened scrutiny under the Equal Protection Clause.  (*Id.* at 17).  The defendants note that the Ninth Circuit case cited by the plaintiff, *Smithkiline Beachum Corp. v. Abbott Labs*, in which the court did apply heightened scrutiny, is incongruent with the holdings of the Fourth Circuit, which is the law which this court must follow. *See Romer v. Evans*, 517 U.S. 620 (1996) (applying rational basis scrutiny to a Colorado constitutional amendment that prohibited measures to protect homosexuals as a class; *Veney v. Wyche*, 293 F.3d 726, 731-732 (4th Cir. 2002) (*Id.*)

The defendants further assert that the plaintiff has misconstrued the Supreme Court authority cited in her brief, and that "[n]either *Lawrence* nor *Windsor* purports to apply anything other than *rational basis scrutiny*."   (*Id.*) (Emphasis in original).   The Reply further states:

> Further, the discussion of laws that classify on the basis of sexual orientation in *Windsor* and the analysis of laws that criminalize private consensual sexual activity in *Lawrence* are wholly inapplicable.  *See Windsor*, 133 S. Ct. at 2690; *see also, Lawrence*, 123 S. Ct. at 2484. Additionally, *Lawrence* held that the Texas law at issue violated the petitioner's civil rights because there was no legitimate state purpose for the law's existence.  123 S. Ct. at 2484.  Without question, there are numerous legitimate reasons why Marshall University should not grant teaching licensure to students who fail to complete their mandatory coursework.

(ECF No. 19 at 16-17).   The Reply concludes:

> With the rational basis standard in mind, despite Plaintiff's threadbare arguments, Plaintiff's inadequate performance and subsequent review is unquestionably *rationally related* to her denial of academic credit.   Frankly, Plaintiff's assertion that she received a grade of "No Credit" based on her homosexuality confuses causation with correlation in an effort to punish Defendants for what is ultimately her own doing.   The four corners of Plaintiff's Complaint, the documents referenced by Plaintiff's Complaint and the undisputed facts all show that Plaintiff's "sexual orientation bias" claim cannot withstand rational basis scrutiny.
>
> Similarly, in response to Defendants' arguments regarding Plaintiff's "class of one" equal protection claim, Plaintiff chose not to challenge the overwhelming strong authority that establishes that the "class of one" theory is ill suited for academic decisions.   [Citations omitted].   As a result, both of Plaintiff's equal protection claims fail as a matter of law.

(*Id.* at 17-18).

The plaintiff's Complaint does not allege any specific facts concerning who, when or how the defendants allegedly learned of her homosexual orientation.   She merely makes conclusory statements that after learning this fact, "defendants" violated their policies and engaged in a "course of conduct hostile to [her] aspirations to become a middle-school social studies teacher . . . ."   (ECF No. 1 at 19, ¶ 87).   Nor has the plaintiff pled any allegations to establish unequal treatment by the defendants concerning similarly-situated students in the MAT program.   Thus, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff's allegations are insufficient to establish a *prima facie* case of "discriminatory animus" based upon her sexual orientation, and thus, her Complaint fails to state a claim upon which relief can be granted under the Equal Protection Clause of the Fourteenth Amendment, as alleged in the Fifth Claim for Relief.

Furthermore, the plaintiff has also failed to allege sufficient facts to demonstrate that the decision to grant her no credit for the student teaching experience lacked a rational basis.   Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff's Complaint also fails to state a claim upon which relief can be granted under the Equal Protection Clause of the Fourteenth Amendment, as alleged in the Sixth Claim for Relief.

### G.    Fair Labor Standards Act claim.

The plaintiff's Seventh Claim for Relief asserts a violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.,* because the plaintiff was not paid minimum wages for what she claims amounted to being a substitute teacher in defendant Kuhn's classroom.   The Complaint states in pertinent part:

105.    The federal Fair Labor Standards Act ("FLSA") provides that all workers must be paid a minimum wage of $7.25 per hour by their employer.

106.    Educational internships are exempt from the FLSA *if and only if* academic credit is given for the work performed.

107.    While employed by [the MUBOG] as Ms. Kerr's Public School Supervising Teacher, and in violation of state law, defendant Kuhn absented himself from his classroom on a regular basis without providing another supervising teacher, thus leaving Ms. Kerr responsible for his classroom duties in excess of 50% of the student teaching placement.

108.    By doing so, defendant Kuhn required Ms. Kerr to work as an unpaid substitute teacher at Scott High School, in violation of West Virginia law and school district policy.

109.    [The MUBOG] is vicariously liable for defendant Kuhn's conduct.

110.    Defendants did not pay Ms. Kerr the minimum wage – or any amount of money – for her work as a substitute teacher.

111.   Ms. Kerr's substitute teaching was not exempt from the FLSA as an educational internship because [the MUBOG] denied Ms. Kerr academic credit for her unpaid substitute teaching work.

112.   Ms. Kerr's right to be paid the minimum wage was non-waivable.

113.   Ms. Kerr incurred injury as a result of defendants' failure to pay wages, as she was deprived of the fruits of her labor.

114.   Defendants Kuhn and [MUBOG] are therefore liable to Ms. Kerr for back pay, liquidated damages, attorney fees, and court costs, in an amount to be determined at trial.

(ECF No. 1 at 22-23, ¶¶ 104-114).

The undersigned first notes that the United States Court of Appeals for the Fourth Circuit recently held that Eleventh Amendment immunity applies to state agencies and officers sued in federal court under the FLSA.   *See Martin v. Wood*, 772 F.3d 192 (4th Cir. 2014).   Thus, as stated previously herein, the plaintiff's Complaint fails to state any plausible claim against the MUBOG, including this FLSA claim.   To the extent that defendant Kuhn may be construed to be a state employee, agent or official, such immunity would extend this claim against him as well.

Additionally, the defendants assert that "the FLSA *specifically does not apply to teachers in public schools.*"   29 U.S.C. § 213(a)(1); *Kay v. Bd. of Educ.*, 547 U.S. 736, 738 (7th Cir. 2008) (Emphasis in original).   (ECF No. 16 at 19-20).   Furthermore, the defendants assert that it is well-settled that "the performance of educational activities by students for an academic institution is not considered 'work' within the meaning of the FLSA.   Likewise, the academic institutions for which students perform educational activities ae not considered 'employers' within the meaning of the FLSA."   *Boblin v. Bd. of Educ.*, 403 F. Supp. 1095, 1106-1107 (D. Haw. 1975); *Walling v. Portland Terminal*

*Co.*, 330 U.S. 148, 152-153 (1974); *see also Blair v. Wills*, 420 F.3d 823 (8th Cir. 2005). Accordingly, the defendants contend that the plaintiff's FLSA claim fails to state a claim upon which relief may be granted and must be dismissed. (*Id.* at 20).

In response, the plaintiff contends that the FLSA's "professional exemption" applies only to persons paid $455 or more per week. 29 C.F.R. § 541.300(a)(1). Because the plaintiff was not paid anything at all for her time spent serving as an effective substitute teacher for defendant Kuhn, she maintains that the FLSA was violated and that she is entitled to the appropriate compensation. (ECF No. 17 at 17).

The defendants' Reply reiterates their position that the plaintiff was never an "employee," but rather, was "a student seeking a degree." (ECF No. 19 at 18). The Reply emphasizes that the reason that the plaintiff did not receive that degree is because she abandoned her academic obligations before the conclusion of the program. The defendants contend that the plaintiff cannot overcome the authority holding that her performance of educational activities as a student teacher is not considered "work" under the FLSA. (*Id.*)

The regulation cited by the plaintiff appears to be inapposite, and, to the extent that this claim is not absolutely barred by the Eleventh Amendment, the statutory provision cited by the defendants appears to be dispositive of the plaintiff's claim. Even if the plaintiff could somehow successfully assert that she was, in effect, a substitute teacher because she failed to receive credit for her student teaching experience, and her supervising teacher, Mr. Kuhn, allegedly frequently left her alone and in charge of his classroom, section 213(a)(1) of the FLSA specifically excludes a "teacher in elementary or secondary schools" from the minimum wage and maximum hour requirements. 29

U.S.C. § 213(a)(1).   Therefore, the plaintiff cannot establish any violation of the minimum wage provision of the FLSA concerning her student teaching experience.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the plaintiff's Complaint fails to state a claim upon which relief can be granted with regard to the Seventh Claim for Relief.

<u>**RECOMMENDATION**</u>

The undersigned proposes that the presiding District Judge **FIND** that the plaintiff's Complaint does not state any facially plausible claim, and that the Complaint, in its entirety, must be dismissed for failure to state a claim upon which relief can be granted.   Accordingly, for the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the defendants' Motion to Dismiss (ECF No. 15), and dismiss this civil action from the docket of the court.

The parties are notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge.   Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendation" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendation" to which objection is made, and the basis of such objection.   Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.   *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).   Copies of such objections shall be served on Judge Johnston.

The Clerk is directed to file this "Proposed Findings and Recommendation" and to mail a copy of the same to the plaintiff and to transmit a copy to counsel of record.


    February 4, 2015

Dwane L. Tinsley
United States Magistrate Judge