**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

LISA MARIE KERR,

                Plaintiff,

v.                               CIVIL ACTION NO.   2:14-cv-12333

MARSHALL UNIVERSITY BOARD
OF GOVERNORS, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendants' Motion to Dismiss (the "Motion to Dismiss"). (ECF 15.) On February 4, 2015, Magistrate Judge Dwane L. Tinsley submitted his Proposed Findings and Recommendation regarding the Motion to Dismiss (the "PF&R"), which recommends that the Court grant the Motion to Dismiss, in its entirety. (ECF 24.) On February 18, 2015, Plaintiff timely filed Objections to Magistrate's Proposed Findings and Recommendation (the "Objections"), in which she objects to all but one of the PF&R's findings, as well as each of the recommendations. For the reasons discussed herein, the Court **OVERRULES** Plaintiff's objections to the PF&R, (ECF 25), **ADOPTS** the PF&R, (ECF 24), to the extent it is consistent with this Memorandum Opinion and Order, **GRANTS** the Motion to Dismiss, (ECF 15), and **DISMISSES** the Complaint, (ECF 1), in its entirety.

1

*I.    Background*

This case arises out of Plaintiff's receipt of a "No Credit" grade for a course she took as a part of the Master of Arts in Teaching program at Marshall University. Plaintiff has legal training and practiced law for over fifteen years. (ECF 1 ¶17.) She enrolled in the graduate program at Marshall University "with a desire to change careers." (*Id.* ¶ 1.)

The Complaint alleges that, as of the fall of 2013, she was a "highly-qualified candidate for teacher certification, enrolled in her final semester of the Master of Arts in Teaching . . . program." (*Id.* ¶ 17.) Plaintiff states that she graduated with honors from her undergraduate institution and law school, held "[a] spotless record with no incidents of professional or academic discipline," attained a high grade point average in the graduate program, received high scores on relevant teaching examinations, and "had never received a single negative evaluation of her academic or professional performance." (*Id.* ¶¶ 17–19.)

In the second half of the fall semester in 2013, Plaintiff participated in the EDF 677 student teaching program. (*Id.* ¶ 22.) In the course of this program, Plaintiff was placed with a teacher in the Boone County School District—Defendant Kuhn. (*See id.*) The Complaint states that "Defendant [Kuhn], at all relevant times, was employed by" Defendant Marshall University Board of Governors ("MUBG") "as the Public School Supervising Teacher" for Plaintiff's student teaching experience. (*Id.* ¶ 10.) The Complaint alleges that, during the course of this placement, "she observed unprofessional conduct by defendant Kuhn, including his frequent absence in violation of Boone County school policy and West Virginia law, leaving Ms. Kerr as a *de facto* unpaid substitute teacher." (*Id.*) The Complaint also alleges that there was "a generalized student resistance to performing any academic activity at all under Ms. Kerr's instructional direction."

2

(*Id.*) The Complaint states Plaintiff attempted to address her concerns regarding her EDF 677 student teaching experience directly with Defendant Kuhn, but he responded with "silence or cursory brush-offs." (*Id.* ¶ 23.)

The Complaint notes that Plaintiff sought advice from "defendant Southard (her University Supervisor) and Bailey (the program coordinator)," but these defendants "stonewalled" her, their responses were "antagonistic, perfunctory, dismissive and even dishonest," and Defendant Southard "routinely ignored Ms. Kerr's e-mails." (*Id.* ¶ 20.) The Complaint states that Plaintiff "had not experienced any such conduct from Marshall employees" before "the Fall 2013 semester." (*Id.* ¶ 21.)

The Complaint alleges, "[o]n information and belief, the deprivation of support by defendants Southard and Bailey was motivated by their knowledge of Ms. Kerr's homosexual orientation, of which they learned in or about August, 2013." (*Id.*) The Complaint also alleges that "after nearly two years of successful graduate study, Marshall suddenly began to treat [Plaintiff] as *persona non grata*" and that "[o]ne possible explanation is that some or all defendants developed animus toward Ms. Kerr upon learning of her homosexual orientation." (*Id.* ¶ 4.)

The Complaint alleges that, "on November 19, 2013, [Plaintiff] discovered that defendant Kuhn had been engaged in ongoing dishonesty" by "inflating the students [sic] grades so substantially that it amounted to a 'free pass' not to do the work Ms. Kerr assigned." (*Id.* ¶ 24.) On the same day, "via email to defendants Southard and Kuhn, Ms. Kerr advised Marshall that defendant Kuhn's conduct had seriously undermined the professional relationship, and that in the exercise of her best professional judgment, Ms. Kerr would suspend further interaction with defendant Kuhn pending follow-up from Marshall." (*Id.* ¶ 25.) In this e-mail, Plaintiff "also

3

advised Marshall of her understanding that she had fully satisfied the requirements for student teaching." (*Id.*) "Defendant Bailey responded the next day (November 20) by scheduling a meeting with Ms. Kerr on December 5 . . . ." (*Id.* ¶ 26.) "From November 20 until the December 5, 2013 meeting, Ms. Kerr received no further communications from defendants." (*Id.*)

During the December 5, 2013 meeting, Defendants Bailey and Eagle (a Dean of the College of Education) told Plaintiff "that she would be denied academic credit for her student teaching experience, would not receive her master's degree, and would not be recommended for teacher certification." (*Id.* ¶ 27.) The Complaint states that "Defendant Bailey read allegations" provided by Defendants Kuhn and Southard. (*Id.*) The Complaint further alleges that, after Plaintiff informed Defendant Bailey she was not aware of any negative allegations by Defendants Kuhn and Southard, Defendants Bailey and Eagle informed Plaintiff of the following:

a. Marshall had already decided, on the basis of the previously-undisclosed information, to deny Ms. Kerr academic credit, graduation and certification;
b. Marshall's alleged policy and practice was to accept any *negative* statement by a public school supervising teacher as true and dispositive against the student;
c. Marshall's alleged policy and practice was *NOT* to provide notice to its students of negative allegations prior to dispositive academic action;
d. Marshall's alleged policy and practice was *NOT* to provide its students opportunity to be heard prior to dispositive academic action.

(*Id.* ¶ 28.) After advising Plaintiff that these actions were "irrevocable," Defendant Bailey allowed Plaintiff to view a statement from Defendant Kuhn regarding Plaintiff (the "Kuhn Statement"). (*Id.* ¶ 29.) The Complaint alleges that the Kuhn Statement included:

a. False accusations of dishonest and unethical conduct against Ms. Kerr.
b. Direct statements by both defendants Kuhn and Southard that Ms. Kerr was unqualified to become a teacher.
c. Evaluations of Ms. Kerr as "unsatisfactory" in numerous areas which had previously, consistently, and *recently* been evaluated as positive, with no evident basis for the change.

4

(*Id.* ¶ 30.) During this meeting, Plaintiff told Defendants Bailey and Eagle that the Kuhn Statement included "false and defamatory" remarks, but these Defendants "repeated that the statements were dispositive." (*Id.* ¶ 29.) The Complaint alleges that Plaintiff also "specifically informed defendants Bailey and Eagle that two schools had asked her to apply for teaching positions, based on their direct observations of Ms. Kerr's classroom performance, and that Ms. Kerr would lose those employment opportunities if Marshall persisted in its course of action." (*Id.* ¶ 31; *cf. id.* ¶ 1 ("Ms. Kerr had at least two prospects for imminent employment as a middle school teacher.").) The Complaint states these Defendants "continued to insist that Marshall's decision was final." (*Id.*) The Complaint also alleges that Defendant Bailey said "you cannot seriously expect that we would give you a degree or recommend you for certification when you have done these things?" (*Id.* ¶ 32.) The Complaint further alleges that Defendants Bailey and Eagle handed "a sheaf of papers" to Plaintiff, dated November 21, 2013, which included the Kuhn Statement "and demanded that Ms. Kerr sign the papers before leaving the room." (*Id.* ¶ 33.) "Near the conclusion of the December 5 meeting, defendant Eagle told Ms. Kerr that her only opportunity to be heard would occur during 'the appeal process,' *after* Marshall had denied her academic credit, graduation and certification, and *after* the Kuhn Statement had become a part of her permanent academic record." (*Id.* ¶ 34.) The Complaint alleges that "Defendant Eagle also told Ms. Kerr that *she* herself would be responsible for deciding Ms. Kerr's appeal, and threatened to disclose the Kuhn Statement directly to Ms. Kerr's prospective employers if Ms. Kerr followed up on appeal." (*Id.* ¶ 35.)

"From December 5, 2013 through December 15, 2013, when Marshall's decision was entered into Ms. Kerr's permanent academic record," Plaintiff urged Defendants to "reconsider their course of action" and "advised defendants of the potential legal liability," but Defendants did

not alter their position. (*Id.* ¶ 36.) Plaintiff pursued Marshall's appeal process, which included

involvement by Defendants Heaton (a Dean of the College of Education) and Pittenger (the Dean

of Graduate Studies). (ECF ¶¶ 14–15, 38.) The Complaint describes this appeals process as

follows:

> a. After Stage One of the "appeal" (to defendants Southard and Bailey), Marshall summarily re-iterated that Ms. Kerr would be denied credit, graduation and certification, stating no rationale, and making no response to the arguments and evidence raised in Ms. Kerr's 24-page appeal statement.
> b. After Stage Two of the "appeal" (to defendants Eagle and Heaton), Marshall relied on *new false statements* plainly contradicted by Marshall's own records, again without acknowledging Ms. Kerr's evidence or arguments.
> c. After Stage Three of the "appeal" (to defendant Pittenger), Marshall *again* failed to respond to Ms. Kerr's original statement *and* her supplemental statement with 20 exhibits refuting the pretexts Marshall had asserted at Stage Two. Instead, Marshall concocted a *new* pretext, asserting that Ms. Kerr's report to Marshall (on the *very day* she learned of defendant Kuhn's deception) was so untimely as to be null and void.

(*Id.* ¶ 38.)

The Complaint asserts that, "[p]rior to defendants' wrongful conduct, Ms. Kerr was only *a

few weeks away* from receiving her Master of Arts in Teaching and becoming certified under West

Virginia law as a teacher of Social Studies, 5-12." (*Id.* ¶ 1.) The Complaint alleges, however, that

Plaintiff "likely will never again obtain professional employment, either as a teacher *or* as an

attorney, as a direct result of the false, misleading and defamatory statements that defendants

caused to be placed in Ms. Kerr's permanent academic record." (*Id.* ¶ 2.)

The Complaint also states that Plaintiff "previously suffered from high blood pressure and

a rapid heart rate, but . . . those conditions had been in remission" and "requir[ed] no medication

for nearly two years" prior to these incidents. (*Id.* ¶ 39.) The Complaint alleges that "during the

course of Marshall's conduct . . . , Ms. Kerr's blood pressure became so elevated that she was

required to seek medical attention" and "[s]he is now unable to control her blood pressure and heart rate through diet and exercise, and is required to take daily medication which limits her activities and causes physical discomfort." (*Id.*) The Complaint states that Plaintiff "also developed chronic acid reflux requiring medication – a condition from which she never previously suffered." (*Id.*)

Plaintiff filed the Complaint pro se on March 14, 2014. (ECF 1.) The Complaint includes seven claims: (1) defamation against Defendants MUBG, Kuhn, Southard, and Bailey, (*id.* ¶¶ 40–53); (2) tortious interference with business expectancy against Defendants MUBG, Kuhn, Southard, Bailey, and Eagle, (*id.* ¶¶ 54–64); (3) tort of outrage against Defendants MUBG, Kuhn, Southard, Bailey, and Eagle, (*id.* ¶¶ 65–73); (4) due process civil rights violations under 42 U.S.C. § 1983 against Defendants MUBG, Southard, Bailey, and Eagle, (*id.* ¶¶ 74–83); (5) equal protection (sexual orientation bias) civil rights violations under Section 1983 against Defendants MUBG, Southard, Bailey, Eagle, Heaton, and Pittenger, (*id.* ¶¶ 84–97); (6) equal protection (class of one) civil rights violations under Section 1983 against Defendants MUBG, Southard, Bailey, Eagle, Heaton, and Pittenger, (*id.* ¶¶ 98–103); and (7) a claim under the federal Fair Labor Standards Act ("FLSA") for unpaid wages, (*id.* ¶¶ 104–114). Plaintiff seeks damages, including punitive damages, back pay, restitution, attorney fees and costs, and injunctive relief requiring MUBG to "[a]ward [Plaintiff] academic credit for EDF 677, Fall 2013," "[a]ward [Plaintiff] a Master's Degree in Teaching, effective December 2013," "[r]ecommend [Plaintiff] for teacher certification under West Virginia law as a teacher of Social Studies, 5-12," "[p]urge [Plaintiff's] academic record of false and defamatory statements," and act "as this Court may deem

appropriate" to correct the alleged harm to Plaintiff's "reputation and economic prospects." (*Id.* at 23–24.)

Pursuant to the Standing Order entered on February 7, 2014, and filed in this case on March 14, 2014, this matter was referred to Magistrate Judge Tinsley for findings of fact and recommendations for disposition. (ECF 3.) On May 14, 2014, Defendants filed the instant Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and/or 12(b)(6). (ECF 15.) Plaintiff filed her opposition on May 28, 2014, (ECF 17), and Defendants filed their reply brief on June 4, 2014, (ECF 19).

On February 4, 2015, Magistrate Judge Tinsley filed the PF&R regarding Defendants' Motion to Dismiss. (ECF 24.) In the PF&R, Magistrate Judge Tinsley "proposes that the presiding District Judge find that the plaintiff's Complaint does not state any facially plausible claim, and that the Complaint, it its entirety, must be dismissed for failure to state a claim upon which relief can be granted." (*Id.* at 51 (emphasis omitted).) As such, Magistrate Judge Tinsley recommends that the Court grant the Motion to Dismiss. (*Id.*)

On February 18, 2015, Plaintiff timely filed the Objections, in which she objects to all but one of the PF&R's findings, as well as each of the recommendations. (ECF 25.) Defendants filed a response to the Objections on March 3, 2015, in which they request that the Court overrule the Objections, adopt the PF&R, and grant the Motion to Dismiss. (ECF 27.) Thus, the Motion to Dismiss, PF&R, and Objections are ready for adjudication.

## II.    *Legal Standard*

### A.    **Review of the PF&R**

The Court is required to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, the Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge "when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985). In addition, the Court need not conduct a de novo review when a plaintiff "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations." *Id.* In reviewing those portions of the PF&R to which Plaintiff objected, this Court will consider the fact that Plaintiff is acting pro se, and her pleadings will be accorded liberal construction. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978).

### B.    **Federal Rule of Civil Procedure 12(b)(1)**

Defendants move for dismissal, in part, pursuant to Federal Rule of Civil Procedure 12(b)(1). "Under Rule 12(b)(1), a federal court must dismiss a claim if the court lacks subject-matter jurisdiction over the claim." *Zimmeck v. Marshall Univ. Bd. of Governors* (*Zimmeck I*), Civil Action No. 3:13–14743, 2013 WL 5700591, at *2 (S.D. W. Va. Oct. 18, 2013) (Chambers, C.J.). "A motion to dismiss pursuant to Rule 12(b)(1) raises the fundamental question of whether a court is competent to hear and adjudicate the claims brought before it." *Id.* "Challenges to jurisdiction under Rule 12(b)(1) may be raised in two distinct ways: 'facial attacks' and 'factual attacks.'" *Id.* (quoting *Thigpen v. United States*, 800 F.2d 393, 401 n.15 (4th Cir. 1986), *rejected on other grounds*, *Sheridan v. United States*, 487 U.S. 392 (1988)).

Under a "facial attack," the defendant argues "that the allegations of the complaint are facially insufficient to sustain the court's jurisdiction." *Thigpen*, 800 F.2d at 401 n.15. "Confronted with a motion of that kind, the court must proceed as it would on a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Id.* "The allegations in the complaint are taken as true, and materials outside the pleadings are not considered." *Id.* (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) and *Williamson v. Tucker*, 645 F.2d 404, 412–13 (5th Cir. 1981)).

In a "factual attack," the defendant contends "that the plaintiff's jurisdictional allegations, though facially adequate, are factually untrue." *Id.* "In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citations omitted). "The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Id.* (citing *Trentacosta v. Frontier Pac. Aircraft Indus., Inc.*, 813 F.2d 1553, 1559 (9th Cir. 1987)).

Defendants' arguments related to Rule 12(b)(1) do not attack the Complaint's factual allegations, but, rather, argue for immunity from suit. (*See* ECF 16 at 5–7.) As such, the Court construes the Motion to Dismiss under Rule 12(b)(1) as a "facial attack" on the Complaint. *See Zimmeck I*, 2013 WL 5700591, at *3.

## C.   Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Allegations "must be simple,

concise, and direct" and "[n]o technical form is required." Fed. R. Civ. P. 8(d)(1).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a civil complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). "[I]t does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court decides whether this standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that "the defendant is liable for the misconduct alleged." *Id.* A motion to dismiss will be granted if, "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards*, 178 F.3d at 244.

### III.    *Extrinsic Evidence*

As a threshold matter, the Court notes that the briefing associated with the Motion to Dismiss and the Objections is replete with references to facts and documents outside of the Complaint. Defendants also attached four exhibits to their Motion to Dismiss: the MAT and Post Bac Programs Student Teacher Handbook (the "Handbook"), (ECF 15, Ex. E); the 2013-2014

11

Marshall University Graduate Catalog (the "Catalog"), (*id.*, Ex. F); and two unpublished cases by courts in this District, (*id.*, Exs. G & H). Along with the Motion to Dismiss, Defendants contemporaneously filed a Motion to Seal FERPA Protected Information (the "Motion to Seal"), which includes four exhibits—the Kuhn Statement and the associated evaluation form and three e-mail correspondences. (ECF 13, Exs. A–D.)

The Court must first determine which documents to consider when ruling on the Motion to Dismiss. Federal Rule of Civil Procedure 12(d) provides:

> If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

"Attaching documents to a motion to dismiss does not automatically change it into a motion for summary judgment, however." *Zimmeck v. Marshall Univ. Bd. of Governors* (*Zimmeck II*), Civil Action No. 3:13–14743, 2014 WL 108668, at *3 (S.D. W. Va. Jan. 10, 2014) (Chambers, C.J.). Rather, "a Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials." *Finley Lines Joint Protective Bd. Unit 200, Bhd. Ry. Carmen v. Norfolk S. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997). The Fourth Circuit provided the following exception to the rule that the court should not consider extrinsic evidence when ruling on a motion to dismiss:

> Although as a general rule extrinsic evidence should not be considered at the 12(b)(6) stage, we have held that when a defendant attaches a document to its motion to dismiss, "a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity."

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)). The Fourth Circuit noted the following reasoning behind this exception:

> The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint. What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)) (internal quotation marks omitted).

Plaintiff does not challenge the authenticity of any of the eight documents attached to the Motion to Dismiss or the Motion to Seal. However, the Court notes that the documents attached to the Motion to Seal were attached neither to the Complaint, nor to the Motion to Dismiss. (*See* ECF 13, Exs. A–D.) As such, the Court will not consider these documents in the motion to dismiss analysis. *See Am. Chiropractic Ass'n*, 367 F.3d at 234; *cf. GTSI Corp. v. Wildflower Int'l, Inc.*, No. 1:09cv123 (JCC), 2009 WL 1248114, at *2–4 (E.D. Va. Apr. 30, 2009) (considering a document attached to the motion to dismiss where the party contemporaneously filed a motion to seal the document).

As to the documents attached to the Motion to Dismiss, the Complaint does explicitly rely on the Handbook. (*See* ECF 1 ¶ 87.) Additionally, as discussed herein, the Handbook is integral to Plaintiff's due process claim. As such, the Court finds that it may rely on this document under the motion to dismiss standard without turning the Motion to Dismiss into a motion for summary judgment. *See Am. Chiropractic Ass'n*, 367 F.3d at 234.

13

However, the Complaint does not explicitly rely on the Catalog. Indeed, the Complaint does not even reference this document. Additionally, this document is not integral to any of Plaintiff's claims. The Court therefore will not consider the Catalog under the instant motion. *See id.*

Accordingly, for purposes of the Motion to Dismiss, the Court will only consider the factual allegations in the Complaint and the information in the Handbook.

## IV.    Sovereign Immunity

The Complaint includes claims against MUBG and, under a liberal reading, the individual Defendants in both their official and personal capacities.[1] Defendants argue that the doctrine of sovereign immunity bars Plaintiff's claims against MUBG and the individual defendants, insofar as the Complaint alleges liability arising out of the actions of the individual defendants acting in an official capacity. (ECF 16 at 5–7.)

The Eleventh Amendment to the United States Constitution provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

"It has long been settled that the reference to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997) (citations omitted). "When deciding whether a state instrumentality may invoke the State's immunity, our cases have inquired into the relationship between the State and

---

[1] In the Motion to Dismiss, Defendants initially argue the Complaint "fails to make any allegations against any Defendant in his or her individual capacity." (ECF 16 at 6.) In the opposition, Plaintiff responded that "[t]he Complaint . . . pleads individual capacity" for the individual defendants "according to the Fourth Circuit (and majority) standard." (ECF 17 at 5–6 (citing *Biggs v. Meadows*, 66 F.3d 56 (4th Cir. 1995)).) In their reply, "Defendants acknowledge that Plaintiff's Memorandum advances an argument that her Complaint fairly alleges causes of action against Defendants in their individual capacities pursuant to *Biggs v. Meadows*, 66 F.3d 56 (4th Cir.

the entity in question." *Id.* In *Regents of the University of California*, the Supreme Court also noted the following:

> Ultimately, of course, the question whether a particular state agency has the same kind of independent status as a county or is instead an arm of the State, and therefore "one of the United States" within the meaning of the Eleventh Amendment, is a question of federal law. But that federal question can be answered only after considering the provisions of state law that define the agency's character.

*Id.* at 429 n.5.

Additionally, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). "As such, it is no different from a suit against the State itself." *Id.* (citations omitted). However, the Supreme Court also clarified that state officials may be sued "in their individual capacities" pursuant to 42 U.S.C. § 1983. *Hafer v. Melo*, 502 U.S. 21, 31 (1991).

In *Zimmeck I*, Chief Judge Chambers addressed the question of whether MUBG is an "arm of the state" for purposes of the sovereign immunity analysis in the context of Section 1983 claims. *See* Civil Action No. 3:13–14743, 2013 WL 5700591, at *5–6 (S.D. W. Va. Oct. 18, 2013) (Chambers, C.J.). After consulting relevant portions of the West Virginia Code, Chief Judge Chambers concluded that MUBG is an "arm of the state" and, as such, enjoys sovereign immunity from Section 1983 claims. *Id.* at *6; *see also* W. Va. Code § 18–2–13d ("[T]he state educational institution located at Huntington, West Virginia . . . shall . . . be known as Marshall University . . . and this university shall remain under the supervision and control of the state board of education."); *id.* § 18B–2A–1 (providing that the Governor of the State of West Virginia appoints members of the MUBG and proscribing rules for the composition of the MUBG). While *Zimmeck*

*I* only directly addressed Section 1983 claims, courts have also found that sovereign immunity applies to the state-law tort claims at issue in the present matter, as well as claims pursuant to the FLSA. *See Martin v. Wood*, 772 F.3d 192, 196 (4th Cir. 2014) (holding that a claim under the FLSA was barred by sovereign immunity); *Akers v. Alvey*, 338 F.3d 491, 497 (6th Cir. 2003) (holding that the plaintiff's tort of outrage claim was barred by sovereign immunity); *Davric Maine Corp. v. U.S. Postal Service*, 238 F.3d 58, 64 (1st Cir. 2001) (holding that a tortious interference claim against the United States Postal Service was barred by sovereign immunity); *Sarkissian v. W. Va. Univ. Bd. of Governors*, Civil Action No. 1:05CV144, 2007 WL 1308978, at *11 (N.D. W. Va. May 3, 2007) (Stamp, J.) (finding that an official of West Virginia University was immune from a suit for defamation in their official capacity).

Plaintiff does not contest that MUBG is an "arm of the state" for purposes of the sovereign immunity analysis, and instead focuses on the exceptions to the doctrine of sovereign immunity. (*See* ECF 17 at 5–7; ECF 25 at 2–5.) As such, absent an exception, sovereign immunity bars Plaintiff's claims against MUBG and the individual Defendants in their official capacity.

There are three exceptions to sovereign immunity. First, sovereign immunity is waived if there is "a 'clear' indication of the State's intent to waive its immunity." *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002) (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675–81 (1999)). Defendants assert that this exception does not apply in this case, and Plaintiff does not contest this assertion. (*See* ECF 16 at 5–7; ECF 17 at 5–7.)

Second, Eleventh Amendment immunity is waived by "Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived

that immunity." *Coll. Sav. Bank*, 527 U.S. at 680–81. For example, a state may "waive its immunity by voluntarily participating in federal spending programs when Congress expresses a clear intent to condition participation in the programs . . . on a State's consent to waive its constitutional immunity." *Litman v. George Mason Univ.*, 186 F.3d 544, 550 (4th Cir. 1999) (internal quotation marks and citation omitted).

Plaintiff argues that, "[b]y accepting federal funds for the School of Education, [MUBG] has waived Eleventh Amendment immunity to Plaintiff's constitutional civil rights claims." (ECF 17 at 6.) In particular, Plaintiff asserts that "[t]he Complaint's allegations of anti-homosexual discrimination . . . may be construed as stating a right to relief under Title IX's proscription of sex discrimination, or alternatively, directly under the Constitution." (ECF 25 at 4.)

Plaintiff is correct in noting the Fourth Circuit "conclude[d] that Congress, in enacting 42 U.S.C. § 2000d–7(a)(1), permissibly conditioned [an educational institution's] receipt of Title IX funds on an unambiguous waiver of [the educational institution's] Eleventh Amendment immunity, and that, in accepting such funding," the educational institution consents to litigate a plaintiff's suit in federal court. *Litman*, 186 F.3d at 555. However, Plaintiff does not bring any claims pursuant to Title IX. (*See* ECF 1); *cf. Litman*, 186 F.3d at 548 (noting the plaintiff's action alleged that the educational institution "and some of its employees discriminated and retaliated against her on the basis of her sex in violation of Title IX of the Education Amendments Act of 1972"). Indeed, the Complaint never even references Title IX. (*See* ECF 1.) Instead, the Complaint includes Section 1983, FLSA, and state-law tort claims. (*See id.*) While the Court liberally construes Plaintiff's claims, it will not fundamentally rewrite the causes of action provided in the Complaint. As such, "the Eleventh Amendment waiver condition in § 2000d–7, in the context of a

17

Title IX action," *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 492 (4th Cir. 2005), is not applicable in the present action.[2]

As to the claims actually pled in the Complaint, "the law is well-settled that Congress has not abrogated Eleventh Amendment immunity in the context of a § 1983 action." *Chafin v. W. Reg'l Jail*, No. 3:13–cv–01706, 2013 WL 3716673, at *5 (S.D. W. Va. July 12, 2013) (Chambers, C.J.) (citing *Quern v. Jordan*, 440 U.S. 332, 340 (1979)). Additionally, Plaintiff raises no arguments that Congress explicitly abrogated the State of West Virginia's sovereign immunity from the Complaint's state-law or FLSA claims, and the Court has no evidence of such explicit abrogation. Accordingly, the Court finds that the second exception to sovereign immunity does not apply in this case.

Under the final exception, a federal court may "issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law, on the rationale that such a suit is not a suit against the state for purposes of the Eleventh Amendment." *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010) (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)). This "exception is narrow: It applies only to prospective relief, does not permit judgments against state officers declaring that they violated federal law in the past, and has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).

The Complaint includes requests for injunctive relief, but only against MUBG—*not* any of the individual Defendants. (*See* ECF 1 ¶¶ 52, 63, 72, 82, 96, 102, 119.) As such, the third exception is inapplicable here. *See, e.g. Metcalf & Eddy*, 506 U.S. at 146.

---

[2] Plaintiff's reliance on *Constantine*, (ECF 17 at 6), is similarly misplaced, as the sovereign immunity discussion in that case related to claims pursuant to Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act. *See* 411 F.3d at 501.

The Court finds that MUBG is an "arm of the state" for purposes of the sovereign immunity analysis, and none of the exceptions to this doctrine apply in this case. Accordingly, the Court also finds that Plaintiff's claims against MUBG and the individual Defendants in their official capacity are barred by the doctrine of sovereign immunity.[3] The Court therefore **GRANTS** the Motion to Dismiss as to all of the claims against MUBG and the individual Defendants in their official capacity.[4] Additionally, as the Complaint only includes requests for injunctive relief against MUBG, the Court **GRANTS** the Motion to Dismiss as to the Complaint's requests for injunctive relief.

Based on the foregoing analysis, the Court now must analyze the Complaint's claims against the individual Defendants in their personal capacity.

## V.    *Defamation*

Plaintiff's First Claim for Relief asserts that Defendants Kuhn, Southard, and Bailey made or ratified defamatory statements about Plaintiff.[5] (ECF 1 ¶¶ 40–53.) Plaintiff asserts that these defamatory statements relate to the November 21, 2013 Kuhn "evaluation and narrative." (*Id.*)

---

[3] In the Objections, Plaintiff asserts that she intended to sue the individual members of MUBG in their official capacity, and not the entity as a whole. (*See* ECF 25 at 5–6 & n.3.) Plaintiff notes she did not name the individual members as defendants "to spare [them] the inconvenience of being named and served as defendants of record in a manner that might impact their personal affairs, since they are sued only in their official capacity." (*Id.* at 6 n.3.)

    As the Court finds that the claims against MUBG, as an entity, and the individual Defendants, in their official capacity, are barred by the doctrine of sovereign immunity, the issue of whether Plaintiff sued MUBG, as an entity, or the individual members, in their official capacity, is now moot. Under either approach, Plaintiff's claims against MUBG are barred.

[4] It is unclear whether the Complaint sufficiently alleges that Defendant Kuhn was an employee of MUBG. (*See* ECF 1 ¶ 10 ("Defendant Gene Brett Kuhn, at all relevant times, was employed by defendant MUBG as the Public School Supervising Teacher for the second half of Ms. Kerr's Fall 2013 Clinical III student teaching experience."); ECF 15, Ex. E (Handbook) at 51 ("Classroom teachers who serve as supervising teachers must . . . [e]nter into a contractual agreement each semester with Marshall University and the COEPD to accept student teachers.").) However, the Court dismisses all claims against the individual Defendants in their official capacity, so this issue is moot.

[5] As the Court dismisses MUBG from this action, it omits any further reference to this entity in Plaintiff's individual claims.

Defendants argue the Court should dismiss this claim because Plaintiff fails to state a claim upon which relief may be granted.[6] (*See, e.g.*, ECF 16 at 7–10.)

Under West Virginia law, "[t]he essential elements for a successful defamation action by a private individual are (1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." *Belcher v. Wal-Mart Stores, Inc.*, 211 W. Va. 712, 719 (2002) (quoting *Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 703 (1983)). "[I]f one element fails, there is no possibility for recovery . . . ." *Id.*

Defendants argue that this claim fails because the assertions in the Kuhn Statement are not defamatory. (*See, e.g.*, ECF 16 at 7–9.) "[A] court must decide initially whether as a matter of law the challenged statements in a defamation action are capable of a defamatory meaning." *Long v. Egnor*, 176 W. Va. 628, 637 (1986) (citations omitted). "A statement may be described as defamatory 'if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Crump*, 173 W. Va. at 77 (quoting Restatement (Second) of Torts § 559 (1977)); *see also Hupp v. Sasser*, 200 W. Va. 791, 796 (1997) ("[S]tatements are defamatory if they tend to 'reflect shame, contumely, and disgrace upon [the plaintiff].'" (quoting *Crump*, 173 W. Va. at 706)).

However, "[a] statement of opinion which does not contain a provably false assertion of fact is entitled to full constitutional protection." *Maynard v. Daily Gazette Co.*, 191 W. Va. 601, 607 (1994). For example, the Supreme Court of Appeals of West Virginia found that written

---

[6] As noted above, Defendants bring the Motion to Dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). However, Defendants' arguments related to the individual counts pertain solely to the merits of these claims and do not implicate this Court's jurisdiction. (*See, e.g.*, ECF 17 at 7–20.) As such, the Court interprets the Motion to Dismiss the individual claims as a motion to dismiss under Rule 12(b)(6).

assertions by an academic dean that a graduate assistant exhibited "unprofessional" and "unacceptable behavior" were "non-fact-subjective conclusions" and, as such, were not actionable under a defamation theory. *Hupp*, 200 W. Va. at 798. "Defamation law requires that you consider the alleged defamatory words in the context in which they were made." *Id.* (citations omitted).

The Complaint asserts the Kuhn Statement included: (1) "false" accusations against "Ms. Kerr of being incompetent, dishonest and unethical," (ECF 1 ¶ 3(a); *see also id.* ¶ 30(a) (asserting the Kuhn Statement included "[f]alse accusations of dishonest and unethical conduct against Ms. Kerr")); (2) "several assertions which were false and defamatory," (*id.* ¶ 29); (3) "[d]irect statements by both defendants Kuhn and Southard that Ms. Kerr was unqualified to become a teacher," (*id.* ¶ 30(b)); and (4) "[e]valuations of Ms. Kerr as 'unsatisfactory' in numerous areas which had previously, consistently, and *recently* been evaluated as positive, with no evident basis for the change," (*id.* ¶ 30(c)). The Complaint's description of the Kuhn Statement indicates it did not include defamatory remarks. In particular, general assertions that the Kuhn Statement included "false" accusations against "Ms. Kerr of being incompetent, dishonest and unethical," (ECF 1 ¶ 3(a)), or "assertions which were false and defamatory," (*id.* ¶ 29), provide no indication that these statements were not based solely on opinion. In addition, the statements that Plaintiff "was unqualified to become a teacher," (*id.* ¶ 30(b)), and "[e]valuations of [Plaintiff] as 'unsatisfactory' in numerous areas," (*id.* ¶ 30(c)), without additional information or context, are solely opinion along the lines of the statements found to be non-factual by the Supreme Court of Appeals of West Virginia in *Hupp v. Sasser*. *See* 200 W. Va. at 798 (finding the statements "unprofessional" and "unacceptable behavior" are "non-fact-subjective conclusions"). While these statements "might

not reflect the same conclusion that other individuals would reach when considering [Plaintiff's] behavior, . . . they are clearly not provably false." *Id.*

Accordingly, the Court **GRANTS** the Motion to Dismiss as to the First Claim for Relief.[7]

## VI.    *Tortious Interference with Business Expectancy*

Plaintiff's Second Claim for Relief is for tortious interference with business expectancy against Defendants Kuhn, Southard, Bailey, and Eagle. (ECF 1 ¶¶ 54–64.) Defendants argue the Court should dismiss this claim on the basis that the Complaint does not sufficiently allege a business expectancy. (*See, e.g.*, ECF 16 at 10–12; *see also id.* (providing an additional argument that Defendants did not intentionally act to interfere with an expectancy).)

"To establish prima facie proof of tortious interference, a plaintiff must show: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." *C.W. Dev., Inc. v. Structures, Inc. of W. Va.*, 185 W. Va. 462, 465 (1991) (quoting *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W. Va. 210, 211 (1983)). Under the first element of a tortious interference claim, "[s]peculation as to the existence of a contractual or business relationship or expectancy is insufficient to establish that element." *Precision Piping & Instruments, Inc. v. E.I. DuPont De Nemours & Co.*, 707 F. Supp. 225, 231 (S.D. W. Va. 1989) (Haden, C.J.). "A mere hope or attempt to obtain future employment, however well-founded . . . does not amount to the 'existence of a contractual or business relationship or expectancy' . . . ."

[7] As the Court determines that the Kuhn Statement only included statements of opinion, it does not reach the issue of whether the Kuhn Statement and the subsequent use of this statement by the individual Defendants satisfies the remaining elements of a defamation claim under West Virginia law. *See, e.g.*, *Shawkey v. Lowe's Home Ctrs., Inc.*, Civil Action No. 2:09–cv–01264, 2011 WL 1229784, at *7 (S.D. W. Va. Mar. 30, 2011) (noting that whether a statement includes defamatory content is a "threshold matter"); *Long*, 176 W. Va. at 637 ("[A] court must decide initially whether as a matter of law the challenged statements in a defamation action are capable of a defamatory meaning.").

22

*Shawkey v. Lowe's Home Ctrs., Inc.*, Civil Action No. 2:09–cv–01264, 2011 WL 1229784, at *13 (S.D. W. Va. Mar. 30, 2011) (quoting *Hatfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d 395, 404 (W. Va. 2008)).

The Complaint includes the following allegations regarding Plaintiff's business expectancy: (1) "Ms. Kerr was only *a few weeks away* from receiving her Master of Arts in Teaching and becoming certified under West Virginia law as a teacher of Social Studies, 5-12," (ECF 1 ¶ 1); (2) Plaintiff "had been invited and encouraged to apply for two teaching positions, based on observations by professional educators of Ms. Kerr's classroom teaching ability," (*id.* ¶ 55; *see also id.* ("Prior to defendants' tortious conduct, Ms. Kerr had submitted an application for one of these positions, and she expected to be interviewed as soon as she graduated from Marshall and received her teaching certification."); *id.* ¶ 1 ("Ms. Kerr had at least two prospects for imminent employment as a middle school teacher."); ¶ 31 (asserting that, "[d]uring the December 5 meeting, Ms. Kerr informed defendants Bailey and Eagle that two schools had asked her to apply for teaching positions, based on their direct observations of Ms. Kerr's classroom performance"); and (3) "despite her excellent qualifications, stellar professional background, and demonstrated enthusiasm and motivation, Ms. Kerr likely will never again obtain professional employment, either as a teacher *or* as an attorney," (*id.* ¶ 2; *see also id.* ¶ 60 ("[G]iven the serious nature of the false statements, it is highly likely that defendants' tortious conduct has rendered Ms. Kerr unemployable in *any* professional capacity . . . .")).

These allegations are clearly insufficient to overcome a motion to dismiss. At no point does Plaintiff point to a specific, valid business expectancy. The strongest allegation is that Plaintiff was encouraged to apply for two positions, submitted an application for one position, and "expected to

be interviewed as soon as she graduated from Marshall and received her teaching certification."
(*Id.* ¶ 55.) However, a hope regarding future employment and speculation as to an individual's
marketability does not create a valid business expectancy for purposes of a tortious interference
claim. *See Shawkey*, 2011 WL 1229784, at *13; *Precision Piping & Instruments,* 707 F. Supp. at
231.

As Plaintiff does not sufficiently allege that she had a valid business expectancy, the Court
finds the Complaint fails to state a claim for tortious interference of business expectancy. *See, e.g.*,
*C.W. Dev., Inc.*, 185 W. Va. at 465. Accordingly, the Court **GRANTS** the Motion to Dismiss as to
the Second Claim for Relief.

## VII.    Tort of Outrage

The Third Claim for Relief is a tort of outrage claim, in which Plaintiff argues that
Defendants' conduct was so outrageous that it caused Plaintiff emotional distress. (ECF 1 ¶¶ 65–
73.) Defendants move to dismiss this claim on the basis that the conduct at issue does not meet the
required outrageousness standard. (*See, e.g.*, ECF 16 at 12–14.)

"[T]he tort of outrage is synonymous with intentional or reckless infliction of emotional
distress." *Williamson v. Harden*, 214 W. Va. 77, 81 (2003). The Supreme Court of Appeals for
West Virginia provided the following test for intentional infliction of emotional distress ("IIED"):

> In order for a plaintiff to prevail on a claim for intentional or reckless
> infliction of emotional distress . . . . [i]t must be shown: (1) that the defendant's
> conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the
> bounds of decency; (2) that the defendant acted with the intent to inflict emotional
> distress, or acted recklessly when it was certain or substantially certain emotional
> distress would result from his conduct; (3) that the actions of the defendant caused
> the plaintiff to suffer emotional distress; and (4) that the emotional distress suffered
> by the plaintiff was so severe that no reasonable person could be expected to endure
> it.

*Travis v. Alcon Labs., Inc.*, 202 W. Va. 369, 371 (1998). "[T]he role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress." *Id.* "Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." *Id.*

In order for conduct to meet this "outrageous" standard, "the conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Harless v. First Nat'l Bank in Fairmont*, 169 W. Va. 673, 695 (1982) (quoting Restatement (Second) of Torts § 46, cmt. d). "Conduct by a defendant which 'is merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, overzealous, or negligent does not constitute outrageous conduct.'" *Bertolotti v. Prunty*, Civil Action No. 3:09–0952, 2010 WL 3743866, at *5 (S.D. W. Va. Sept. 21, 2010) (Chambers, J.) (quoting *Hines v. Hills Dep't Stores, Inc.*, 193 W. Va. 91, 95 (1994)). The Supreme Court of Appeals of West Virginia declined to further "define what will make a case of outrageous conduct," instead defining "what it is not on a case-by-case basis." *Hines v. Hills Dep't Stores, Inc.*, 193 W. Va. 91, 96 (1994). As cases addressing this claim illustrate, IIED "is a difficult fact pattern to prove." *Id.* at 96; *see Garrett v. Viacom, Inc.*, No. Civ. A. 1:03CV22, 2003 WL 22740917, at *4 (N.D. W. Va. Aug. 27, 2003) ("[F]ew courts have found that a plaintiff has met the 'extreme and outrageous' standard under West Virginia law."). *Compare Zimmeck I*, Civil Action No. 3:13–14743, 2013 WL 5700591, at *9 (S.D. W. Va. Oct. 18, 2013) (Chambers, C.J.) (finding no IIED where a dismissed medical student alleged a supervisor filed a report stating she "violated standards of professionalism" and the defendants'

25

actions in dismissing the student from the program "occurred within the confines of an established system for student dismissals, albeit one which [the plaintiff] claims was unfair and improperly used"), *and Bertolotti*, 2010 WL 3743866, at *6 (finding no IIED where a student claimed a teacher "ridiculed her and questioned her ability to properly assess a patient's health in light of her hearing impairment" and "spoke in a hostile and demeaning tone," but "any public humiliation or embarrassment was minimal"), *and Hamilton v. Life Savers, Inc.*, Civ. A. No. 93–0070–C, 1993 WL 757335, at *4–5 (N.D. W. Va. Dec. 28, 1993) (finding no IIED where the plaintiff claimed "his supervisor stated, among other things, that he was still untrained after twenty years of service with the defendants" and "that he was unprofessional"), *with Bell v. Nat'l Republican Cong. Comm.*, 187 F. Supp. 2d 605, 618 (S.D. W. Va. 2002) (Goodwin, J.) (denying summary judgment on IIED claim where the defendants "labeled" the plaintiff as "a child molester and rapist"), *and Miller v. SMS Schloemann-Siemag, Inc.*, 203 F. Supp. 2d 633, 638–40 (S.D. W. Va. 2002) (Haden, C.J.) (denying motion to dismiss as to the IIED claim where the plaintiff alleged that "[i]n exchange for transporting her mortally injured husband back to the United States," the defendant "demanded" that she sign a written agreement acknowledging the defendant's assistance in transporting her husband and that the defendant did not admit any liability for the husband's injuries).

Plaintiff argues Defendants acted outrageously by adding the Kuhn Statement and the associated form to her permanent academic record, and by Defendant Eagle allegedly threatening "to provide the false and misleading statements . . . directly to Ms. Kerr's prospective employers." (ECF 1 ¶¶ 66–67.) The Court finds the alleged conduct does not meet the "outrageous" standard. While Plaintiff notes these actions may cause some public harm in the future, she does not allege

26

that they have, at present time, caused public humiliation or embarrassment. (*See, e.g.*, ECF 1 ¶ 59 (noting that Plaintiff is not applying for positions because doing so would spread the information contained in the Kuhn Statement).) The Court does not try to minimize any mental or physical harm Plaintiff suffered arising out of Defendants' actions. However, the "outrageous" standard is exacting, and the conduct of Defendants in reviewing Plaintiff's work, acting within an established academic process—albeit one Plaintiff asserts was not followed—and stating they will pass along this information to prospective employers does not satisfy the "outrageous" conduct threshold. *See, e.g.*, *Zimmeck I*, 2013 WL 5700591, at *9.

As the Complaint fails to sufficiently allege that Defendants' conduct was outrageous, the tort of outrage claim cannot survive the Motion to Dismiss. *See, e.g.*, *Travis*, 202 W. Va. at 371. Accordingly, the Court **GRANTS** the Motion to Dismiss as to the Third Claim for Relief.

### VIII.   Section 1983 Claims

The Complaint includes three civil rights claims pursuant to 42 U.S.C. § 1983, including a due process claim and two equal protection claims under sexual orientation bias and "class of one" theories. (ECF 1 ¶¶ 74–103.) Defendants move to dismiss these claims under Rule 12(b)(6). (ECF 16 at 14–19.)

Section 1983 provides the following:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266,

271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "To maintain a § 1983 action, [the plaintiff] must show that: (1) he has been deprived of a right secured by the Constitution and the laws of the United States, and (2) that the defendants deprived him of this right while acting under 'color of any [law].'" *Tincher v. Fink*, No. Civ. A. 2:03-0030, 2005 WL 1845319, at *3 (S.D. W. Va. Aug. 2, 2005) (Goodwin, J.) (citing *Lugar v. Edmondson Oil Co.*, 922 U.S. 930, 939 (1982)).

### A.   Due Process Claim

The Fourth Claim for Relief alleges a violation of Plaintiff's constitutional rights under the Due Process Clause of the Fourteenth Amendment by Defendants Southard, Bailey, and Eagle. (ECF 1 ¶¶ 74–83.) The Complaint does not specify whether this due process claim alleges a violation of Plaintiff's procedural or substantive due process rights. (*See id.*) The Court therefore addresses both theories. (*See, e.g.*, ECF 16 at 14–17 (addressing both procedural and substantive due process theories).)

### 1.   Protected Property Interest

Defendants first argue that Plaintiff fails to state a claim that she holds a protected property interest, which is required for a valid procedural or substantive due process claim. (ECF 16 at 14–15.) "In order to make out either a substantive or procedural due process claim, a plaintiff must allege sufficient facts to support a finding that the [plaintiff was] 'deprived of life, liberty, or property, by governmental action.'"[8] *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011) (quoting *Beverati v. Smith*, 120 F.3d 500, 502 (4th Cir. 1997)). "A protected property interest cannot be created by the Fourteenth Amendment itself, but rather must be created

---

[8] The Complaint specifically alleges that Defendants deprived Plaintiff of a property interest and does not include any allegations regarding a life or liberty interest. (ECF 1 ¶ 76.)

or defined by an independent source." *Id.* (citations omitted). Courts provided the following oft-cited definition of a property interest:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Mallette v. Arlington Cnty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 634 (4th Cir. 1996) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

The Complaint alleges that Plaintiff held "protected property interests in academic credit, graduation, certification and prospective employment." (ECF 1 ¶ 76.) The parties do not cite any case law specifically addressing whether a plaintiff has a protected property interest in these academic or prospective employment areas. Nonetheless, in the context of continuing education, "[n]either the Fourth Circuit nor the Supreme Court has ruled directly on the issue of whether a property interest exists in continuing education." *Abbas v. Woleben*, Civil No. 3:13CV147, 2013 WL 5295672, at \*7 (E.D. Va. Sept. 19, 2013); *see also Nofsinger v. Va. Commonwealth Univ.*, Civil Action No. 3:12–CV–236, 2012 WL 2878608, at \*6 (E.D. Va. July 13, 2012) ("The Fourth Circuit has never held that continued enrollment in graduate school constitutes a protected property interest."). As Defendants note, many district courts found that plaintiffs do not have a protected property interest in continuing education. *See, e.g.*, *Abbas*, 2013 WL 5295672, at \*7 (holding that "the plaintiff does not have a property interest in continuing his medical education" based on clear authority within that district); *Nigro v. Va. Commonwealth Univ. Med. Coll. of Va.*, Civil Action No. 5:09–CV–00064, 2010 WL 2262539, at \*5 (W.D. Va. June 4, 2010) (finding the plaintiff did not have a property interest in her continued enrollment in a residency program).

However, other courts decline to dismiss due process claims for lack of pleading a

29

protected property interest in continuing education and, instead, assume the existence of a protected property interest for purposes of the motion to dismiss stage. In *Zimmeck II*, Chief Judge Chambers provided the following description of this approach and its application:

> [A]n independent source can create a protected property interest in some situations, and a contract can be one such independent source. *Osborne v. King*, 570 F. Supp. 2d 839 (S.D. W. Va. 2008) ("in order to have a protected property interest in his employment, a person must possess a legitimate claim of entitlement to it—created, for example, by contract or state law") (citation omitted) (internal quotation marks omitted) . . . . However, "[n]ot all rights derived from contractual relationships with the state qualify as constitutional property rights." *Uzoukwu v. Prince George's Cmty. Coll. Bd. of Trs.*, Civil Action No. DKC 12–3228, 2013 WL 4442289, at *8 (D. Md. Aug. 15, 2013) (citing *Coastal Corp. v. Cnty. of Currituck*, 734 F.2d 175, 178 (4th Cir. 1984)). Many courts have taken the pragmatic approach of assuming the existence of a protected property interest at the motion to dismiss stage. *See, e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 222 (1985).

> The Court notes that Plaintiff's original Complaint referred to the Marshall University Student Handbook, the Student Impairment Assistance Policy, the Marshall University Graduate Catalog, and "MUSOM policy," which the Court infers to mean the Academic and Professionalism Policy. In her Response, Plaintiff refers to these documents as proof that she has a protected property interest. Her later Amended Complaint, however, only contains reference to the Academic and Professionalism Policy and the Student Impairment Assistance Policy. In light of this situation, the Court will take the same route as other courts and will assume—without deciding—that Plaintiff has plausibly pled a protected property interest for the purpose of deciding this motion to dismiss.

Civil Action No. 3:13–14743, 2014 WL 108668, at *7 (S.D. W. Va. Jan. 10, 2014) (Chambers, C.J.).

In the present case, the Complaint includes only one reference to a relevant outside document that may arguably form a contractual basis for a property right—the Handbook. (ECF 1 ¶ 87 (discussing the Handbook in the context of the sexual orientation bias equal protection claim).) In the opposition to the Motion to Dismiss, Plaintiff focuses on the language in the

Handbook regarding established procedures for addressing issues with student teachers.[9] (*See* ECF 17 at 12.) The Court will follow the approach of Chief Judge Chambers in *Zimmeck II* and "assume—without deciding—that Plaintiff has plausibly pled a protected property interest for the purpose of deciding this motion to dismiss." 2014 WL 108668, at *7.

    2.  <u>Procedural Due Process Claim</u>

Assuming for now that Plaintiff has pled a viable property interest, the Court turns to Plaintiff's procedural due process claim. Defendants argue that, even "[a]ssuming for the sake of argument that Plaintiff could establish a protected property interest, her procedural due process claim would still fail because she received all of the process she was due." (ECF 16 at 15.)

"In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 126 (1990) (citations omitted); *see also Carey v. Piphus*, 435 U.S. 247, 261 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."). "Where the deprivation of a protected interest is substantively justified but procedures are deficient in some respect, there

---

[9] Plaintiff focuses on the following portions of the Handbook when discussing these procedures:

> Supervisors must maintain and share with the student teacher any documentation of deficiencies so that he/she can have time to attempt to correct them. This not only protects the student's due process rights, but it protects supervisors from possible grade appeals. It is therefore in everyone's best interest if classroom supervisors and university supervisors:
>
>     . . .
>
> Are prepared to assist with creating a formal written Plan of Improvement as soon as it appears that the student teacher may not pass the field experience at the current level of performance. This plan will be presented to the student teacher, leaving enough time for the student teacher to make improvements. This Plan must indicate the problems to be overcome and the deadlines by which significant improvement must be noted. The university supervisor will put this into writing and help present it to the student teacher.

(ECF 15, Ex. E, at 43; *see* ECF 17 at 12.)

may well be those who suffer no distress over the procedural irregularities." *Carey*, 435 U.S. at 263. "Moreover, where a deprivation is justified but procedures are deficient, whatever distress a person feels may be attributable to the justified deprivation rather than to deficiencies in procedure." *Id.*

Courts have substantially elaborated on the due process procedures required in an academic setting—particularly in those situations involving the permanent dismissal of a student. *See, e.g. Clark v. Whiting*, 607 F.2d 634, 643–44 (4th Cir. 1979). In these opinions, courts draw a distinction between disciplinary and academic evaluations when determining the required due process procedures. *See, e.g., id.* In the disciplinary context, "[i]f a student is dismissed from a public education program for disciplinary reasons—rather than academic reasons—that student is entitled to, at the least, 'oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.'" *Zimmeck II*, 2014 WL 108668, at *8 (quoting *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). By contrast, in the context of an academic evaluation, "[t]he standard . . . is substantially relaxed" and "[a]ll that is necessary to ensure that a plaintiff has received constitutionally required process is a finding that the decision 'was not so arbitrary and capricious that a reviewing court can confidently say of it that it did not in the end involve the exercise of professional judgment.'" *Betts v. Rector & Visitors of Univ. of Va.*, 939 F. Supp. 461, 469 (W.D. Va. 1996) (quoting *Siu v. Johnson*, 748 F.2d 238, 245 (4th Cir. 1984)).

In the seminal case of *Board of Curators of the University of Missouri v. Horowitz*, the Supreme Court provided a lengthy discussion regarding academic evaluations:

> Academic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative

32

fact-finding proceedings to which we have traditionally attached a full-hearing requirement. In *Goss,* the school's decision to suspend the students rested on factual conclusions that the individual students had participated in demonstrations that had disrupted classes, attacked a police officer, or caused physical damage to school property. The requirement of a hearing, where the student could present his side of the factual issue, could under such circumstances provide a meaningful hedge against erroneous action. The decision to dismiss respondent, by comparison, rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal. Such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. *Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.*

Under such circumstances, we decline to ignore the historic judgment of educators and thereby formalize the academic dismissal process by requiring a hearing. The educational process is not by nature adversary; instead it centers around a continuing relationship between faculty and students, one in which the teacher must occupy many roles—educator, adviser, friend, and, at times, parent-substitute. This is especially true as one advances through the varying regimes of the educational system, and the instruction becomes both more individualized and more specialized. In *Goss,* this Court concluded that the value of some form of hearing in a disciplinary context outweighs any resulting harm to the academic environment. Influencing this conclusion was clearly the belief that disciplinary proceedings, in which the teacher must decide whether to punish a student for disruptive or insubordinate behavior, may automatically bring an adversary flavor to the normal student-teacher relationship. The same conclusion does not follow in the academic context. We decline to further enlarge the judicial presence in the academic community and thereby risk deterioration of many beneficial aspects of the faculty-student relationship. We recognize . . . that a hearing may be useless or harmful in finding out the truth as to scholarship.

435 U.S. 78, 90 (1978) (emphasis added) (internal quotation marks and citations omitted); *cf. id.* at

91 ("Judicial interposition in the operation of the public school system of the Nation raises

problems requiring care and restraint . . . . By and large, public education in our Nation is

committed to the control of state and local authorities." (quoting *Epperson v. Arkansas*, 393 U.S.

97, 104 (1968))). As noted by the Fourth Circuit, "[i]n the context of due-process challenges . . . a

court should defer to a school's professional judgment regarding a student's academic or professional qualifications." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (2012) (citations omitted).

In the instant case, Plaintiff argues Defendants infringed on her protected property rights through the procedures they used to evaluate her performance in the EDF 677 student teaching program and ultimately deciding that she would not receive credit for her performance. (*See, e.g.*, ECF 17 at 11–14.) While Plaintiff argues this decision and the procedures employed by Defendants had lasting negative ramifications, the decision boils down to a determination by Defendants related to the "grade" Plaintiff received for this course. The Court finds that this is a quintessentially academic determination requiring Defendants' unique evaluations of Plaintiff's performance. *See, e.g.*, *Horowitz*, 435 U.S. at 90.

As the Court finds the relevant determination to be purely academic, the question becomes whether Defendants' decision was "arbitrary and capricious." *Betts v. Rector & Visitors of Univ. of Va.*, 191 F.3d 447, at *8 (4th Cir. 1999) (citing *Siu*, 748 F.2d at 245). "A decision is arbitrary and capricious if, in the end, it did not 'involve the exercise of professional judgment.'" *Id.* (citing *Siu*, 748 F.2d at 245).

The Complaint states that Defendants made the determination to not give Plaintiff credit for the EDF 677 course on the basis of the Kuhn Statement and the associated evaluation form.[10] (ECF 1 ¶¶ 27–38.) The Complaint describes the contents of the Kuhn Statement as stating Plaintiff

---

[10] The Complaint notes that, during the appeals process, Defendants provided alternative reasons to uphold the decision to give Plaintiff no credit for the EDF 677 course. (*See* ECF 1 ¶ 38(b) ("After Stage Two of the 'appeal' (to defendants Eagle and Heaton), Marshall relied on *new false statements* plainly contradicted by Marshall's own records, again without acknowledging Ms. Kerr's evidence or arguments."); *id.* ¶ 38(c) ("Marshall concocted a *new* pretext, asserting that Ms. Kerr's report to Marshall (on the *very day* she learned of defendant Kuhn's deception) was so untimely as to be null and void.").) However, the Complaint never asserts that the individual Defendants abandoned their reliance on the Kuhn Statement—which the Complaint repeatedly asserts was the basis to give Plaintiff no credit for the course. (*See id.* ¶¶ 27–38.)

34

engaged in "unethical" or "dishonest" conduct, "was unqualified to become a teacher," and Plaintiff's performance as "unsatisfactory" in numerous areas. (ECF 1 ¶ 30.) Based on the allegations in the Complaint, the Court cannot find that Defendant Kuhn was either "arbitrary" or "capricious" in providing this evaluation of Plaintiff's performance. The Court also cannot find that the remaining Defendants' determination was either "arbitrary" or "capricious" due to the alleged contents of the Kuhn Statement. As such, the Court defers to Defendants' professional academic judgment. *See, e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment.").

Additionally, as Defendants' determination was purely academic, the Court does not find the appeal procedures violated Plaintiff's procedural due process rights. Indeed, in such a situation, "a hearing is not required by the Due Process Clause of the Fourteenth Amendment." *Horowitz*, 435 U.S. at 86 n.3.

For the foregoing reasons, the Court finds Plaintiff's procedural due process claim fails to state a claim upon which relief may be granted. Accordingly, the Court **GRANTS** the Motion to Dismiss as to the procedural due process claim in the Fourth Claim for Relief.

### 3. Substantive Due Process Claim

The Fourth Claim for Relief may also be read as raising a substantive due process claim. (*See* ECF 1 ¶¶ 84–97.) "[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). As to this type of claim, "the constitutional violation actionable under

§ 1983 is complete when the wrongful action is taken." *Id.* (citing *Daniels*, 474 U.S. at 331.). "[B]y barring certain government actions regardless of the fairness of the procedures used to implement them . . . [the Due Process Clause] serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels*, 474 U.S. at 331–32 (quoting *Murray's Les v. Hoboken Land & Improvement Co.*, 18 How. (59 U.S.) 272, 277 (1856)). However, "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998); *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989) ("[T]he Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation.").

"[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 129 (1992)). "To establish a violation of substantive due process, a student must demonstrate arbitrary and capricious conduct on the part of university officials by showing that there was no rational basis for the university's decision or must show that the [action] was motivated by bad faith or ill will unrelated to academic performance." *Tigrett v. Rector & Visitors of Univ. of Va.*, 137 F. Supp. 2d 670, 678 (W.D. Va. 2001) (quoting *Cobb v. Rector & Visitors of Univ. of Va.*, 69 F. Supp. 2d 815, 826 (W.D. Va. 1999)); *see Zimmeck II*, Civil Action No. 3:13–14743, 2014 WL 108668, at *11 (S.D. W. Va. Jan. 10, 2014) (Chambers, C.J.) (quoting *Abbas v. Woleben*, Civil No. 3:13CV147, 2013 WL 52572, at *7 (E.D. Va. Sept. 19, 2013)) (providing the same standard). "A plaintiff must demonstrate some 'egregious official conduct' which constitutes 'an abuse of power that shocks the conscience.'" *Tigrett*, 137 F. Supp. 2d at 678

36

(quoting *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 965 (7th Cir. 1998)); *see Waybright v. Frederick Cnty., Md.*, 528 F.3d 199, 205 (4th Cir. 2008) (citing *Cnty. of Sacramento*, 523 U.S. at 846) ("[T]he Supreme Court has . . . marked out . . . conduct wrong enough to register on a due process scale as conduct that 'shocks the conscience,' and nothing less."). *See generally Butler v. Rector & Bd. of Visitors of Coll. of William & Mary*, 121 F. App'x 515, 519 (4th Cir. 2005) (discussing a substantive due process claim in an academic context).

As discussed above, the Court cannot find that Defendants' conduct was either arbitrary or capricious. The Complaint does include allegations that Defendants acted in bad faith or ill will arising out of their knowledge of Plaintiff's sexual orientation. (*See, e.g.*, ECF 1 ¶¶ 87–88.) However, the Complaint only specifically identifies Defendants Southard and Bailey as having knowledge of Plaintiff's sexual orientation prior to the academic determination and appeals process, (*id.* ¶ 21 ("On information and belief, the deprivation of support by defendants Southard and Bailey was motivated by their knowledge of Ms. Kerr's homosexual orientation, of which they learned in or about August, 2013.")), and otherwise provides only a general allegation regarding the knowledge of the remaining Defendants, (*id.* ¶ 87 (alleging that "*after* learning of Ms. Kerr's homosexual orientation, defendants engaged in a course of conduct hostile to Ms. Kerr's aspiration to become a middle-school social-studies teacher").) In addition, the Complaint fails to make specific allegations as to how *any* Defendant learned of Plaintiff's sexual orientation. These generalized allegations are insufficient to plead Defendants' knowledge and, absent such knowledge, Plaintiff fails to plead that Defendants acted in bad faith or ill will.

The Court thus finds that the Complaint fails to state a claim that Defendants' conduct was arbitrary or capricious or motivated by bad faith or ill will. As such, Plaintiff fails to state a

37

substantive due process claim. *See, e.g.*, *Tigrett*, 137 F. Supp. 2d at 678. The Court therefore **GRANTS** the Motion to Dismiss as to the substantive due process claim in the Fourth Claim for Relief.

### B.    Equal Protection—Sexual Orientation Bias Claim

Defendants next seek dismissal of the Fifth Claim for Relief, which alleges that Defendants Southard, Bailey, Eagle, Heaton, and Pittenger violated Plaintiff's right to equal protection under the Fourteenth Amendment. (ECF 16 at 17–19.) Specifically, the Fifth Claim for Relief provides allegations that these Defendants' conduct was motivated by their knowledge of Plaintiff's homosexual orientation. (ECF 1 ¶¶ 84–97.)

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. The Equal Protection "Clause 'does not take from the States all power of classification,'" *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001) (quoting *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 271 (1979)), "but 'keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike,'" *id.* (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."[11] *Id.* "Once this showing is

---

[11] In the Objections, Plaintiff argues the following:

> The Complaint articulates a claim of *intentional* discrimination. Because Plaintiff does not assert a disparate treatment claim, Plaintiff should not be required to allege "unequal treatment by defendants concerning similarly-situated students in the MAT program." Nor should Plaintiff be required to allege a statutory history that shows "animus," because that standard applies to claims of disparate impact, not to intentional discrimination.

made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* (citations omitted).

The Court does not have to address the appropriate level of scrutiny here, as the first requirement is clearly lacking. As discussed above, the Complaint fails to provide any specific allegations as to when or how each individual Defendant learned of Plaintiff's sexual orientation. Instead, the Complaint provides only generalized allegations that Defendants Southard and Bailey knew of Plaintiff's sexual orientation "in or about August, 2013," (ECF 1 ¶ 21), and Defendants, as a whole, engaged in the alleged conduct "*after* learning of Ms. Kerr's homosexual orientation," (*id.* ¶ 87). Absent specific factual allegations as to the knowledge of each Defendant, the Complaint fails to allege that Defendants' conduct was "the result of intentional or purposeful discrimination." *See Morrison*, 239 F.3d 648 at 654. Additionally, the Complaint is completely devoid of any allegation that Defendants' treatment of Plaintiff differed from similarly situated students. These allegations are insufficient to overcome a motion to dismiss. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (providing the motion to dismiss standard).

Accordingly, the Court **GRANTS** the Motion to Dismiss as to the Fifth Claim for Relief.

---

(ECF 25 at 16–17.) Plaintiff then suggests the Court employ the test provided in *Croteau v. Fair*, 686 F. Supp. 552 (E.D. Va. 1988). (*Id.* at 17–20.)

The Court is not persuaded by Plaintiff's argument, as Plaintiff cites to no authority from the Fourth Circuit Court of Appeals to support her assertion that a test other than that followed by the Fourth Circuit in in *Morrison v. Garraghty* is appropriate. (*See id.* at 16–20); *see also Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011) ("In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." (citing *Morrison*, 239 F.3d at 654)). Regardless, as discussed herein, the Complaint also fails to state a claim under the *Croteau* test because it provides insufficient allegations that Defendants knew about Plaintiff's sexual orientation. *See Croteau*, 686 F. Supp. at 553–54 (quoting *Johnson v. Brelje*, 521 F. Supp. 723, 729 (N.D. Ill. 1981)) ("Plaintiff need only show . . . that the underlying discriminatory purpose is a motivating factor; [it] need not be the sole, or even the dominant factor.").

C.     **Equal Protection—"Class of One" Claim**

The Sixth Claim for Relief alleges that the "denial of academic credit, graduation and certification to Ms. Kerr" by Defendants Southard, Bailey, Eagle, Heaton, and Pittenger "was arbitrary and capricious, and lacked a rational basis." (ECF 1 ¶ 99 (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000).) *See generally Vill. of Willowbrook*, 528 U.S. at 563 (referring to this type of claim as a "class of one" equal protection claim). Defendants move to dismiss this "class of one" claim on the basis that it fails to state a claim upon which relief may be granted. (ECF 16 at 17–19.)

In a "class of one" equal protection claim, "the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis in treatment." *Vill. of Willowbrook*, 528 U.S. at 564 (citations omitted). The Supreme Court has held that the "class of one" equal protection theory does not apply in the context of public employment:

> There are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603 (2008). As Defendants note, many courts in the Fourth Circuit—including in this District—interpreted the Supreme Court's decision in *Engquist* as meaning a "class of one" equal protection theory is inapplicable in the context of public education. *See, e.g.*, *Zimmeck II*, Civil Action No. 3:13–14743, 2014 WL 108668, at *5 (S.D. W. Va. Jan. 10, 2014) (Chambers, C.J.) ("This Court has not found—and Plaintiff has not pointed to—any cases from the Fourth Circuit that refute the proposition that the 'class of one' theory does

not apply in public education settings. This Court agrees with the reasoning of the other district courts in this Circuit and accordingly finds that Plaintiff cannot use a 'class of one' equal protection theory here."); *Uzoukwu v. Prince George's Cmty. Coll. Bd. of Trs.*, Civil Action No. DKC 12–3228, 2013 WL 4442289, at *10 (D. Md. Aug. 15, 2013) (dismissing the plaintiff's "class of one" claim and noting that "[m]uch like deciding what grade to give a student or what discipline to impose, an educational institution's decisions about restricting access to its campus facilities implicates subjective, individualized assessments"); *Nofsinger v. Va. Commonwealth Univ.*, Civil Action No. 3:12–CV–236, 2012 WL 2878608, at *11 (E.D. Va. July 13, 2012) ("The Court agrees with those courts that have found the public education context [a] . . . poor fit for class-of-one equal protection claims due to the inherently discretionary decisionmaking that occurs there."), *aff'd*, 523 Fed. App'x 204 (2013). Plaintiff offers no authority from within the Fourth Circuit to controvert this growing trend.

The Court is persuaded by those courts—and particularly Chief Judge Chambers' opinion in *Zimmeck II*, which specifically addressed the educational institution at issue here—that hold the Supreme Court's decision in *Engquist* precludes the application of a "class of one" equal protection theory in the public education setting. Plaintiff's "class of one" claim therefore fails.

Accordingly, the Court **GRANTS** the Motion to Dismiss as to the Sixth Claim for Relief.

## IX.    *FLSA Claim*

Defendants also move to dismiss the Seventh Claim for Relief, which alleges a claim against Defendant Kuhn pursuant to the FLSA for Plaintiff's unpaid work as a student teacher in the EDF 677 program. (ECF 16 at 19–20.)

"The FLSA was enacted to protect 'the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others.'" *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (quoting *Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir. 1999)). "And because the Act is remedial and humanitarian in purpose, it should be broadly interpreted and applied to effectuate its goals." *Benshoff*, 180 F.3d at 140 (internal quotation marks and citations omitted).

"Those seeking compensation under the Act bear the initial burden of proving that an employer-employee relationship exists and that the activities in question constitute employment for purposes of the Act." *Id.* (citing *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986)). "Once this burden is met, the employer bears the burden of proving entitlement to any exemptions or exceptions to the Act's compensation requirements." *Id.* (citing *Johnson v. City of Columbia*, 949 F.2d 127, 129–30 (4th Cir. 1991)).

The Seventh Claim for Relief specifically argues that Plaintiff is entitled to a minimum wage for her work in the EDF 677 student teaching program. (ECF 1 ¶ 105 ("The [FLSA] provides that all workers must be paid a minimum wage of $7.25 per hour by their employer.").) 29 U.S.C. § 206 provides the minimum wage requirement and states:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates:
> (1)     Except as otherwise provided in this section, not less than—
> . . .
> (C) $7.25 an hour, beginning [in 2009].

29 U.S.C. § 206(a). For purposes of this statute, an "[e]nterprise engaged in commerce or in the production of goods for commerce" includes "a preschool, elementary or secondary school, or an

institution of higher education," regardless of whether the institution is "public or private or operated for profit or not for profit." *Id.* § 203(s)(1)(B). As such, the school where Plaintiff engaged in her student teaching program is an "[e]nterprise engaged in commerce or in the production of goods for commerce" for purposes of the minimum wage requirement statute. *See id.*

"The [FLSA] . . . provides little guidance as to what constitutes an employer-employee relationship or 'employment' sufficient to trigger its compensation provisions." *Benshoff*, 180 F.3d at 140. In making the determination of whether an employer-employee relationship exists, "courts remain mindful that 'the employer-employee relationship does not lend itself to rigid per se definitions, but depends upon the circumstances of the whole activity.'" *Id.* at 141 (quoting *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1361 (8th Cir. 1993)).

The first issue is whether Defendant Kuhn is an "employer" for purposes of Section 206. The FLSA defines an "employer" as, in relevant part, "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d). The Supreme Court noted the "expansiveness" of the term "employer," *Falk v. Brennan*, 414 U.S. 190, 195 (1973), and the term is "to be construed liberally because by it Congress intended to protect the country's workers," *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971 (5th Cir. 1984). Additionally, "it is well settled that an individual may qualify as an employer and face liability under the FLSA." *Roman v. Guapos III, Inc.*, 970 F. Supp. 2d 407, 416 (D. Md. 2013).

Employers include persons who have managerial responsibilities and "substantial control of the terms and conditions of the work of . . . employees." *Falk*, 414 U.S. at 195; *see also Brock v. Hamad*, 867 F.2d 804, 808 n.6 (4th Cir. 1989) (finding that an individual was an "employer" for

43

purposes of the FLSA where he "hired and directed the employees" who worked for a company). "In deciding whether a particular individual is an 'employer' for purposes of the FLSA, courts apply an 'economic reality' test, examining the totality of the circumstances to determine whether the individual has sufficient operational control over the workers in question and the allegedly violative actions to be held liable for unpaid wages or other damages." *Miller v. Colorcraft Printing Co.*, No. 3:03 CV 51–T, 2003 WL 22717592, at *3 (W.D.N.C. Oct. 16, 2003). "Under the 'economic reality' test, the relevant factors include 'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)); *see, e.g.*, *Mould v. NJG Food Serv. Inc.*, 37 F. Supp. 3d 762, 775 (D. Md. 2014) (applying the "economic reality" test); *Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 720 (E.D.N.C. 2009) (same). "No one of the four factors standing alone is dispositive," and, instead, "the 'economic reality' test encompasses the totality of the circumstances." *Herman*, 172 F.3d at 139 (citation omitted).

The Court finds that the Complaint fails to sufficiently allege that Defendant Kuhn was an "employer" under the FLSA. The Complaint alleges that Defendant Kuhn was Plaintiff's "Supervising Teacher" during her participation in the EDF 677 student teaching course, (ECF 1 ¶¶ 10 & 107), Plaintiff acted as a "*de facto* unpaid substitute teacher" when Defendant Kuhn was absent from the classroom, (*id.* ¶ 22; *see id.* ¶ 107 ("[D]efendant Kuhn absented himself from his classroom on a regular basis without providing another supervising teacher.")), Plaintiff attempted "to address" her concerns with Defendant Kuhn, (*id.* ¶ 23), and Defendant Kuhn evaluated

44

Plaintiff's performance during the EDF 677 course and submitted that evaluation to the other individual Defendants, (*id.* ¶¶ 27–38). However, the Complaint utterly fails to allege any indicia of Defendant Kuhn's control over the conditions under which Plaintiff worked at the school, or that Defendant Kuhn held the authority to terminate her student teaching position. Indeed, the Complaint indicates that Defendant Kuhn only had the authority to submit an evaluation to the other individual Defendants, who themselves held the authority to act. (*See id.* ¶¶ 27–38.) These allegations are insufficient to plead that Defendant Kuhn was an "employer" under the FLSA and, as such, Plaintiff's FLSA claim against Defendant Kuhn fails.[12] *See, e.g.*, *Falk*, 414 U.S. at 195; *Brock*, 867 F.2d at 808 n.6; *Herman*, 172 F.3d at 139.

Accordingly, the Court **GRANTS** the Motion to Dismiss as to the Seventh Claim for Relief.

## X.     *Conclusion*

For the reasons discussed above, the Court **OVERRULES** Plaintiff's objections to the PF&R, (ECF 25), **ADOPTS** the PF&R, (ECF 24), to the extent it is consistent with this Memorandum Opinion and Order, **GRANTS** the Motion to Dismiss, (ECF 15), **DISMISSES** the Complaint, (ECF 1), in its entirety, and **DIRECTS** the Clerk to remove this case from the Court's docket.

**IT IS SO ORDERED**.

---

[12] As the Court finds that the Complaint fails to sufficiently allege that Defendant Kuhn was an "employer" under the FLSA, it does not reach the issue—on which the parties focused most of their briefing for this claim, (*see, e.g.*, ECF 16 at 19–20; ECF 17 at 17)—as to whether Plaintiff's relevant "teaching" activity falls under the 29 U.S.C. § 213(a)(1) exemption. *See Benshoff v. City of Va. Beach*, 180 F.3d 136, 140 (4th Cir. 1999) (noting that the court should first address whether there was an employer-employee relationship, then determine whether an exemption applies).

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

ENTER:        March 26, 2015

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

46